Ronald R. S. PICERNE et al.

v.

Edward D. DiPRETE et al.

No. 79–329–Appeal.

Supreme Court of Rhode Island.

April 28, 1981.

Letts, Quinn & Licht, Frank Licht, Richard A. Licht, Robert N. Huseby, Sr., Providence, for plaintiffs.

Hinckley, Allen, Salisbury & Parsons, Michael P. DeFanti, Providence, for defendants.

## OPINION

BEVILACQUA, Chief Justice.

The defendants appeal from a judgment of the Superior Court ordering them to

expunge from the tax rolls of the city of Cranston certain assessments made on the plaintiffs' property and permanently enjoining the defendants from collecting any taxes based on these reassessments.

The plaintiffs to this action are a group of Cranston taxpayers who own apartment buildings containing six or more units.[1] The defendants are various Cranston public officials including Mayor Edward DiPrete, Tax Assessor Armando DiVincenzo, and Tax Collector and Treasurer Anthony Ruscetta.[2]

The following facts were adduced at trial. Sometime in February 1979, defendant Mayor DiPrete discussed tax revenues with the City Director of Administration, Thomas Powers. At approximately the same time, DiPrete learned from Assessor DiVincenzo that normal yearly adjustments in the tax base would yield about $1,300,000. These projected increases came from new construction, additions, and improvements not exempt by law. Thereafter, on March 9, 1979, the mayor sent the following memo to Director Powers:

"According to figures given to me by Tax Assessor Armando DiVincenzo, the city can expect an increase in additional tax revenue of $1,306,055.76 on the 1979 tax role [sic].

"After reflection, I feel it is not only possible, but absolutely essential that additional tax revenue be raised through more thorough and updated assessments of value. Possible sources include updating of rural land values to reflect sewers and/or water, more thorough assessment of tangible personal property, updated values on certain business streets to reflect changes in circumstances, and a service charge tax on owners of apartment houses. I am sure that other possibilities

also exist—including assessments on overlooked building improvements.

"Therefore, I direct that you chair a committee to be composed of the tax assessor, the city treasurer, and the finance director, in addition to yourself to identify those assessments necessary to raise an additional $1,200,000.00 in addition to the $1,306,055.76 cited by the tax assessor.

"I ask that you give me an interim report by Wednesday, March 14, 1979."[3]

As a result of the memo a committee was formed and began to meet on a regular basis, with the mayor attending most of these meetings. During this period, the committee started to examine property assessment records, or "cards," of nonframe apartment buildings with six or more units.[4] The mayor and committee members decided the values assessed on many of these apartments, as revealed by the cards, were too low. Under the Cranston assessment system, the assessor assigns a value grade ranging from C– to A+ to each apartment building. Using a price schedule, the assessor assigns to each grade a replacement cost per square foot with gradual increases in price from C– to A+. Other factors affecting value include the number of stories in the building plumbing facilities, and other improvements.

In concluding that the valuation of these apartments was incorrect, the committee considered tangible and intangible evidence. The committee found some discrepancies revealed by the cards themselves. For example, a two-story brick building graded A and built in 1961 was given a replacement cost of $38 per square foot while a second two-story brick building graded A and built in 1967 was assigned a replacement cost of

1. A second group of plaintiffs, composed of rural landowners in western Cranston, and an individual utility company settled their claims against defendants before this appeal was heard.

2. The various plaintiffs brought several actions, four of which were heard together. In one of these, Finance Director Mary Gliottone was also joined as a named defendant.

3. The mayor later learned that he needed $1,600,000 to meet the city's budgetary requirements because DiVincenzo had overestimated the normal increases by $343,000.

4. In assessing apartments, Cranston distinguishes between frame and masonry or brick-constructed buildings.

$21.50 per square foot. The committee was not content, however, with bringing merely similar buildings of similar grade into line by reference to the existing price schedule. The committee, without conducting any physical inspections, looked at the cards and decided that some apartments "deserved" a higher grade than that appearing on the card.

Having regraded a number of apartments upward, the committee next reformulated the pricing schedule for grades B– through A+ only. The result was that approximately forty apartment buildings or complexes were revalued in a span of about a week with an accompanying increase in the tax base of over half a million dollars.

It should be pointed out that the last time a general revaluation was conducted in Cranston was in 1954 when the city revalued all property. None of the defendants has asserted that any attempt was made in March 1979 to revalue all property. As Mr. DiVincenzo admitted, "I neither had the time nor the staff to do it." Nor does anyone seriously contend that revaluation of plaintiffs' property was the beginning of a planned citywide revaluation program.

According to the mayor, the city discovered the "mistakes" in the apartment valuation scheme during a review of the cards to examine the possibility of attaching an apartment service charge. Mayor DiPrete claimed he was only asking the committee to rectify past inequities that had turned up after the committee reviewed the cards. The mayor stated his primary goal was equality of valuation and that increasing revenue was only a secondary aim; yet, he also testified that when he wrote the March 9 memo, he knew of no inequities in assessed values of any apartments.

No one disputes the fact that of almost 16,000 single-family residences in Cranston,

the assessor revalued none—or even seriously considered revaluing any of these dwellings during the committee meetings in March. The same conclusion holds true for almost 3,000 two- to six-family residences, 798 commercial establishments, and more than 7,000 parcels of vacant land. Indeed, the final figures reveal that only 114 out of more than 28,000 parcels were revalued and that all of these parcels are owned by members of one of the three groups of plaintiffs that originally initiated this litigation.[5]

Among his findings of fact, the trial justice found that Assessor DiVincenzo had considered the assessments for 1979 complete when he finished his task sometime before December 31, 1978. The court stated that

"[i]mplicit in this finding is the fact that the ratable property subject to taxation on December 31, 1978—which included the property of these plaintiffs—was assessed at its full and fair cash value or at a uniform percentage thereof."[6]

The court further found that defendant had made a conscious effort to avoid a general revaluation and instead had targeted the smallest number of parcels that could yield the needed revenue. The court rejected defendants' assertion that their purpose was to equalize assessments and determined that defendants' purpose was to satisfy a $1,600,000 revenue gap.

Ultimately, the trial justice found that the March 1979 revaluations were arbitrary and discriminatory and resulted in disproportionate assessments, and that such assessments violated the fair-distribution clause of art. 1, sec. 2 of the Rhode Island Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.[7] The issue we confront in this appeal is whether defendants' revaluation of plaintiffs' proper-

---

**5.** See note 1 *supra*.

**6.** Although plaintiffs have challenged the revaluation procedure and to some extent the values assigned, we note that plaintiffs do not contend that defendants assessed their property at a percentage of fair market value differing from the uniform rate applied in Cranston.

**7.** Additionally, the Superior Court justice held that the assessments violated state law because they were not made by defendant Assessor DiVincenzo.

ties was intentionally selective and made in a discriminatory manner.

Before deciding this issue, we deem it important to note that other jurisdictions have dealt with taxpayer suits concerning selective assessments. These cases are characterized by the singling out of one taxpayer or a small group of taxpayers for revaluation or for first-time assessment when similar property is not assessed for any tax liability. Such cases are distinguishable from those cases in which revaluation takes place over several years pursuant to a well-organized multiyear plan. *See, e. g., Hamilton v. Adkins,* 250 Ala. 557, 560, 566, 35 So.2d 183, 185, 191, *cert. denied,* 335 U.S. 861, 69 S.Ct. 133, 93 L.Ed. 407 (1948); *Rogan v. County Commissioners of Calvert County,* 194 Md. 299, 310, 71 A.2d 47, 51 (1950). Because revaluations must be carried out in an acceptable and orderly manner, selective assessments are generally held unlawful as discriminatory against the complaining taxpayer. *E. g., County of Maricopa v. North Central Development Co.,* 115 Ariz. 540, 543–44, 566 P.2d 688, 691–92 (Ct.App.1977); *Ernest W. Hahn, Inc. v. County Assessors for Bernalillo County,* 92 N.M. 609, 612, 592 P.2d 965, 968 (1978); *Penn Phillips Lands, Inc. v. State Tax Commission,* 247 Or. 380, 385, 430 P.2d 349, 351–52 (1967). An illegal assessment has also been found to exist where a different method of appraising land values was applied to a small number of properties within a county. *Sparks v. McCluskey,* 84 Ariz. 283, 285–86, 327 P.2d 295, 296–97 (1958).

In *Ernest W. Hahn, Inc. v. County Assessors for Bernalillo County,* 92 N.M. 609, 592 P.2d 965 (1978), the taxpayers' property was revalued each year for four successive years, whereas over 90 percent of other land in the county was not revalued. The Supreme Court of New Mexico stated that the county had discriminated against the taxpayers because they "were singled out for selective enforcement" and because "the * * * reappraisals * * * were not conducted as part of a definite and logical plan for the revaluation of all properties within Bernalillo County * * *." *Id.* at 612, 592 P.2d at 968. The *Hahn* court continued by stat-

ing that a taxpayer may not complain about a legally proportionate assessment unless the assessment was made as part of a discriminatory plan or involved fraudulent action. *Id.* at 613, 592 P.2d at 969.

In *Penn Phillips Lands, Inc. v. State Tax Commission,* 247 Or. 380, 430 P.2d 349 (1967), the defendant tax commission attempted to justify its selective reassessment of the plaintiff's properties by protesting that the plaintiff's sales campaign had made its property "unique." The Oregon court rejected this argument and observed that "[a]ll adjacent private lands have remained assessed at pre-1957 values and the complaining taxpayer is the only one whose property has been subjected to special treatment. It is this kind of discrimination which runs afoul [of] the federal constitution * * *." *Id.* at 385, 430 P.2d at 351–52.

■ Recently, while reviewing examples of illegal assessments, we noted that a knowing or intentional assessment that is made discriminatorily would be unlawful. *CIC—Newport Associates v. Stein,* R.I., 403 A.2d 658, 663 (1979). Therefore, in order for us to grant the relief prayed for by plaintiffs, they must show that defendants intentionally sifted them out for reassessment. The defendants, however, relying on *Merlino v. Tax Assessors for the Town of North Providence,* 114 R.I. 630, 337 A.2d 796 (1975), contend that plaintiffs' burden extends beyond a showing of mere discrimination. The defendants argue that plaintiffs must demonstrate that "a substantial amount of property (in Cranston) was taxed at a lower percentage of fair market value than their property." We disagree and find that defendants' reliance on the *Merlino* case is misplaced.

In *Merlino,* the plaintiffs-taxpayers alleged that the defendants had illegally revalued their property under an assessment plan making revaluation mandatory when property was sold or when a change occurred in the physical nature of the property. The value of the plaintiffs' newly purchased home had been promptly reappraised at the time of purchase by the defendants.

The *Merlino* court sustained the assessment because the taxpayers had failed to prove that other property in North Providence had been assessed at a percentage of fair market value less than that of the plaintiffs' property, notwithstanding the defendants' failure to revalue neighboring property.

In the instant case, however, plaintiffs have presented a different challenge. The plaintiffs argue that the assessments are void because they were intentionally made with a discriminatory motive.[8] Although the trial justice concluded, as a matter of fact and law, that the revaluations resulted in "disproportionate taxation to the plaintiffs," he also remarked that plaintiffs pressed two major points. The first of these was that "their [defendants'] assessments were selected and therefore arbitrary and illegal * * *."[9] Thus, the precise issues involved in *Merlino* and the instant case are clearly distinguishable. The taxpayers' burden articulated in *Merlino* is apposite only to the issue of whether the tax assessor has disproportionately assessed the taxpayers pursuant to an otherwise valid revaluation scheme.

▪ In the case at bar, the trial justice concluded that the revaluations were selective and patently discriminatory. He found that defendants intended to revalue only plaintiffs' property. These findings are to be given great weight on appeal. *CIC—Newport Associates v. Stein*, R.I., 403 A.2d at 662. And when the trial justice's findings are supported by legally competent evidence, such findings will not be disturbed unless the justice is shown to be clearly wrong or unless he has overlooked or misconceived material evidence. *See Edward R. Marden Corp. v. S & R Construction Co., Inc.*, 112 R.I. 332, 336, 309 A.2d 675, 677 (1973).

▪ The defendants have maintained throughout this litigation that they acted only to correct past assessment errors that actually discriminated against the large majority of Cranston property owners who, they argued, were correctly assessed. We wish to make clear that correcting past inequities without a general revaluation is not illegal per se or violative of constitutional uniformity or equal-protection provisions. But when the tax authorities act out of improper or discriminatory motives, the legitimacy of the revaluation process ends. *See Schreiber v. Reimcke*, 11 Wash.App. 873, 875, 526 P.2d 904, 906 (1974).

▪ After reviewing the record, we are satisfied that the trial justice ruled correctly. The evidence indicates that Mayor DiPrete decided the city needed $1,200,000 in additional revenues over the amount anticipated from normal increases. Eventually, this figure was increased to $1,600,000. The mayor's March 9 memo to Director Powers needs no further illumination to explain the mayor's intention with regard to plaintiffs' property. Subsequently, 114 out of 28,614 parcels were revalued; general revaluation had not taken place in Cranston since 1954. The revalued properties were confined to brick apartments with six or more units, rural properties in Western Cranston, and two utility companies. No serious attempt was made to revalue other property in the city, and no physical inspections were made of the revalued properties. Rather, defendants drew up a new assessment formula for the selected apartments which formula, along with the utility and rural property revaluations, produced just enough income to meet the city's projected revenue needs. We find therefore that there is abundant legally competent evidence underlying the factual findings of the trial justice and supporting his ruling that defendants assessed plaintiffs' property in an improper and illegal manner.

▪ Finally, we approve of the nature of the trial justice's remedy ordering the defendants to expunge the March 1979 reas-

---

8. As a separate issue, plaintiffs argue that the new formula applied to revalue their property resulted in disproportionate taxation.

9. The second major point, as noted by the trial justice, was that "the assessments are not those of the tax assessor, but of the Powers' Committee."

sessments and permanently enjoining the defendants from collecting taxes based on these reassessments. Under the circumstances of this case, we find that this type of relief is appropriate. *See Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 446, 43 S.Ct. 190, 192, 67 L.Ed. 340, 343 (1923); *Ernest W. Hahn, Inc. v. County Assessors for Bernalillo County*, 92 N.M. at 613–14, 592 P.2d at 969–70.

The defendants' appeal is denied and dismissed, and the case is remanded to the Superior Court.

SHEA, J., did not participate.