CAPITAL PROPERTIES, INC.

v.

STATE of Rhode Island et al.

No. 99–324–Appeal.

Supreme Court of Rhode Island.

Dec. 2, 1999.

1070

Gerald John Petros, Brent Canning, Providence, for Capital Properties.

Jeffrey Gladstone, Providence, for Union Station Associates et al.

Richard G. Riendeau, Joseph S. Larisa, Jr., Philip W. Noel, Charles J. McGovern, Eugene Coulter, James R. Lee, Providence, for defendant.

Present WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

WEISBERGER, Chief Justice.

This case comes before us on an appeal by the state of Rhode Island (state) and the city of Providence (city) from summary judgments entered in the Superior Court arising from four civil actions that were consolidated for trial before Justice Thom-

as H. Needham of the Superior Court. These cases involve separate but related disputes among the plaintiff, Capital Properties, Inc. (CPI), the state, and the city. These disputes include the issues of payment by the state and the city of a condemnation award entered in the Superior Court in favor of CPI in which the fairmarket value of property condemned by the state for the Providence River Relocation Project was set in the sum of $10,653,-328.03. The disputes include a purported assessment by the city of taxes on other property owned by CPI in the Capital Center area based upon the valuation made by the Superior Court in the condemnation procedure. This reassessment of taxes covered a period for the years 1991 to 1997. The disputes also include a proceeding commenced by the Providence Redevelopment Agency to condemn a parcel of real estate in the Capital Center area referred to in this litigation as parcel No. 9. All these disputes were resolved by summary judgments entered in the Superior Court.

The state opposed the entry of summary judgment that required it to pay the entire balance of the condemnation award, subject to reimbursement by the city for its 50 percent share and credit by CPI for a sum already paid by the state and also for reimbursement by CPI for the value of land (parcel No. 9) that the state had conveyed to CPI to pay the state's share of the condemnation award. The city appealed from the summary judgments that enjoined the city from its purported retroactive tax increase and invalidated the purported condemnation of parcel No. 9, and also appealed from the conditional summary judgment requiring the city to reimburse the state for 50 percent of the payment that the state would make to satisfy the condemnation award.

We are of the opinion that for the reasons stated in the opinion of Justice Needham the appeals by the state, the city, and the Providence Redevelopment Agency[1] are without merit. We adopt the opinion of Justice Needham as our own but make the following modifications to the summary judgment entered in the Superior Court.

1. By reason of a waiver entered in open court by counsel for CPI, the state shall not be required to pay its 50 percent share of the award to CPI since CPI acknowledges that it has already received full reimbursement for the state's share by an earlier payment plus the conveyance of parcel No. 9 from the state to CPI. Consequently the state shall, pursuant to the summary judgment entered in the Superior Court, pay to CPI within twenty days from the date of this opinion the 50 percent share of the condemnation award that was held in the Superior Court to be attributable to and ultimately payable by the city.

2. Within twenty days of the date of the payment by the state of the share of the award attributable to the city, the city shall, pursuant to the conditional summary judgment entered in the Superior Court, pay to the state complete reimbursement for the state's payment to CPI of the city's share of the condemnation award.

In all other respects the judgments entered by the Superior Court are affirmed and the appeals by the state and the city are denied and dismissed. The opinion of Justice Needham is appended hereto as exhibit A and made a part hereof. The papers in the case may be remanded to the Superior Court for issuance of execution on the summary judgments already rendered and for further proceedings relating to issues that are still pending before the Superior Court in respect to the parties to this litigation.

---

**1.** The Providence Redevelopment Agency was involved in that portion of the suit involving the purported condemnation of parcel No. 9.

STATE OF RHODE ISLAND AND
PROVIDENCE PLANTATIONS

PROVIDENCE, SC
SUPERIOR COURT

CAPITAL PROPERTIES, INC., Plaintiff,

v.

STATE OF RHODE ISLAND, Defendant.

C.A. No. 88–1654

WILLIAM D. ANKER, Ph.D., Director, Dept. of Transportation, State of Rhode Island, Plaintiff,

v.

STEPHEN T. NAPOLITANO, Treasurer, and VINCENT A. CIANCI, Mayor, City of Providence; CAPITAL PROPERTIES, INC., Defendants.

C.A. No. 98–2525

CAPITAL PROPERTIES, INC., Plaintiff,

v.

CITY OF PROVIDENCE; THOMAS P. ROSSI, Individually and in his capacity as Tax Assessor for the City of Providence, and ANTHONY ANNARINO, Individually and in his capacity as Tax Collector for the City of Providence; JOHN DOE, Alias, Defendants.

C.A. Nos. 97–4199, 98–5202

CAPITAL PROPERTIES, INC., Plaintiff,

v.

PROVIDENCE REDEVELOPMENT AGENCY; PROVIDENCE CITY COUNCIL, by and through its Members in their official capacities, Evelyn V. Fargnoli, Council President, et al., Defendants.

C.A. No. 98–6254

DECISION

NEEDHAM, J.

These are civil actions involving the State of Rhode Island, the City of Providence, and Capital Properties, Inc., wherein our Supreme Court, in *Capital Properties, Inc. v. State of Rhode Island,* No. 98–394–Appeal, Order Entered (December 3, 1998), 726 A.2d 12, has remanded to the Court C.A. No. 88–1654 and has ordered this Court to "consolidate, hear, and decide all claims and defenses, including, but not limited to, title to [P]arcel 9, alleged unpaid taxes owed by CPI to the [C]ity, any agreements between the [C]ity and the [S]tate, and any further unresolved claims between the parties." *See Appendix A.* This Court notes that the Supreme Court "under its supervisory and revisory powers has the authority to fashion remedies" *Cheetham v. Cheetham,* 121 R.I. 337, 342, 397 A.2d 1331, 1334 (1979) (citations omitted), that will "serve the ends of justice" and end the controversy. *Vincent v. Musone,* 574 A.2d 1234, 1235 (R.I.1990); *See also Lancellotti v. Lancellotti,* 543 A.2d 680, 682 (R.I.1988). The Supreme Court may remand a case to the Superior Court "with such directions as are necessary and proper" to carry out this purpose. *E & J Inc. v. Redevelopment Agency of Woonsocket,* 122 R.I. 288, 296, 405 A.2d 1187, 1192 (1979) (citations omitted). Moreover, this Court is "mindful that an important goal in the administration of justice is repose. A matter should not be allowed to linger indefinitely" *Audette v. Coletti,* 539 A.2d 520, 522 (R.I.1988), and the Court may "fashion a remedy to bring [ ] litigation to a definite conclusion . . . without reference to procedural impediments. . . ." *School Committee of the Town of North Providence v. North Providence Federation of Teachers, Local No. 920 (AFL—CIO),* 476 A.2d 1037, 1040 (citation omitted). With these principles in mind, the above entitled case actions, which represent all unresolved claims and defenses between the parties, are hereby consolidated before this Court.

The parties have filed motions for summary judgment. This Court renders a

Decision herein in accordance with Super.Ct.R.Civ.P. Rule 56.

### FACTS AND TRAVEL

#### A) C.A. No. 88–1654: Final Judgment for Condemnation Damages

On April 6, 1988, Capital Properties, Inc. (CPI) filed C.A. No. 88–1654, seeking a determination of the fair market value of property condemned by the State of Rhode Island (State) in connection with the Providence River Relocation—Memorial Boulevard Extension Project (Providence River Relocation Project) in the City of Providence (City). *See Decision by Justice Francis J. Darigan, Jr.,* No. PC 88–1654, March 5, 1997, Darigan, J. (1997 WL 839896). On May 6, 1997, the Superior Court, Darigan, J., entered a Final Judgment in the amount of $10,653,-328.03 for condemnation damages in favor of CPI. On July 22, 1998, the Superior Court granted CPI a Writ of Mandamus ordering the State to make payment of the Final Judgment plus accrued interest. *See Decision by Justice Dominic F. Cresto,* No. PC 88–1654, July 22, 1988, Cresto, J. (1998 WL 474085). The State has appealed this Decision to the Supreme Court. *See Capital Properties, Inc. v. State of Rhode Island,* No. 98–394–Appeal, *supra.* The Supreme Court has deferred further consideration of this appeal until this Court consolidates, hears, and decides all unresolved claims and defenses between the parties. *Id.*

#### B) C.A. No. 98–2525: Declaratory Judgment

On May 26, 1998, the State filed C.A. No. 98–2525, seeking declaratory relief pursuant to the Uniform Declaratory Judgment Act, R.I.G.L. § 9–30–1 *et seq.,* concerning the contractual rights and obligations of the parties with respect to payment of the Final Judgment in C.A. No. 88–1654. The State has moved for summary judgment against CPI, arguing that the State has already paid its contractual share of the Final Judgment. The State also has moved, although reluctantly, for "conditional" summary judgment against the City. The State argues that the City, not the State, is contractually liable to pay CPI the remaining share of the Final Judgment. Additionally, the State argues the alternative, that if this Court determines the State is liable to pay CPI the Final Judgment, then the City is contractually liable to the State for one half the Final Judgment. In response, CPI has moved for summary judgment against the State, arguing that the State, not the City, is the proper judgment debtor and is contractually obligated to pay the condemnation award. The City opposes the motions by the State and CPI, arguing that the contract between the State and City is void and unenforceable for lack of City Council authorization. The City also contests the jurisdiction of this Court to hear this declaratory judgment complaint arguing that the State is not a proper party plaintiff.

Additionally, CPI has moved for summary judgment against the City. The City claims that the conveyance of certain property in the Capital Center District, known as Parcel 9, by the City to the State, and subsequently the conveyance by the State to CPI, is void. CPI argues that the City Council of the City (City Council) passed Resolutions Nos. 177 and 472 authorizing the Mayor to convey Parcel 9 to the State and that the Mayor did in fact convey this property by deed. The State then conveyed Parcel 9 to CPI.

After thorough examination of the evidence presented and factual proffers made by the parties, the Court finds the following undisputed facts. On January 16, 1987, CPI and the State signed an Agreement (CPI–State Agreement) in settlement "of all outstanding problems between them relating to the river relocation...." Paragraphs 1 and 6 provide, in part, that the "State will condemn the land of [CPI] necessary to accomplish the river relocation and construction of Memorial Boule-

vard...." CPI agreed to "dismiss with prejudice the suit filed against the State and the City ... [and] to release the State and City from all liability relating to the river relocation ...; however, [this release] shall not extend to condemnation payments under Paragraphs 1 and 6 hereof."

Paragraph 4 referenced a separate agreement between the State and the City, entitled Providence River Relocation—Memorial Boulevard Extension Project Comprehensive Agreement (State–City Agreement), signed by the State and City on January 16, 1987, acknowledging that "the State and the City will be sharing the costs of condemnation referred to under paragraphs 1 and 6 hereof." Paragraph 4 also states, in pertinent part, that the

> State hereby agrees to convey said parcel 9 to [CPI]. As consideration for this conveyance ... [CPI] will pay to the State a sum equal to the State's share of the total condemnation proceeds awarded [CPI] under paragraphs 1 and 6 hereof. The balance of the condemnation proceeds shall remain the property of [CPI]. No subsequent amendment of said Agreement between the State and the City shall affect the rights of [CPI] under this paragraph.

Furthermore, on January 16, 1987, the State and CPI signed a Settlement Agreement which was an agreement among the State, City, and CPI to settle claims in a lawsuit filed by CPI. However, the City did not sign this Settlement Agreement, and paragraph 8 states, in pertinent part, that this

> Agreement will not become effective until it has been executed by all of the parties hereto.... The fact of the execution of this Agreement by any of the parties hereto shall not be used as evidence against any such party in any legal proceedings involving the subject matter of this Agreement, unless and until this Agreement has been executed by all three signatories....

On March 29, 1985, the City Council issued a Resolution, Resolution of the City Council No. 177, authorizing the Mayor "to execute an agreement ... with the State ... regarding the Memorial Boulevard Extension Project ... set[ting] forth the obligations of the City ... concerning the relocation of the Moshassuck and Woonasquatucket Rivers, traffic improvement within that area, and other matters relative to said property...."

On January 16, 1987, the State and the City signed the State–City Agreement which provided for the "relocation of the Moshassuck and Woonasquatucket Rivers" and "extension of Memorial Boulevard" and set out "funding commitments" and "cost-sharing provisions." Section 208, Responsibility for Property Acquisition, subsection (b) provides that "the City and the State shall share equally in all costs and expenses not borne by a third party arising out of acquisition of such real property." Moreover, Section 308, Payments by City, subsection (a) states, in pertinent part, that

> [a]s provided in Exhibit IV hereto, the City has agreed to make payments in cash to the State of its financial obligations under this Agreement as follows ... (iv) At such time as may be required, in the event that land acquisition costs exceed the estimates set forth for land acquisition in Exhibits II and III, a payment in an amount sufficient to satisfy the City's obligations under section 208(b).

The aforementioned Exhibit IV is a Preliminary Agreement made between the State and City, and a letter from the City to the State recognizing and incorporating the same, both dated October 8, 1985. In paragraph 4, the letter states, in pertinent part, that

> any and all cost overruns or short falls incurred or experienced with respect to any element of this Project, including, but not limited to, ... land acquisition expenses and costs and any costs, expenses, fees, awards, judgments, or set-

tlements arising out of any litigation or threat of litigation relating to such elements, shall be borne by the State and City in equal shares.

Moreover, the Preliminary Agreement, Section 4, Funding Allocation, subsection c, Cost savings, shortfalls, states, in pertinent part, that the

State and the City hereby agree that ... all cost savings achieved or cost overruns or shortfalls incurred or experienced with respect to any element of this Project, such saving or shortfall, if not had or borne by a third party funding entity, be had or borne by the State and the City in equal shares.

On November 13, 1987, the State condemned approximately two acres of property owned by CPI and paid CPI $2,599,-050 the fair market value determined by the State. On July 7, 1989, the City transferred Parcel 9 by Deed to the State; the Deed was signed by the Mayor and approved by the City Solicitor. On September 13, 1989, the State conveyed Parcel 9 to CPI. On September 26, 1989, the City Council issued Resolution No. 472 acknowledging the authority of the Mayor pursuant to Resolution No. 177 to execute an agreement with the State regarding the Providence River Relocation Project. The City Council also authorized the Mayor to convey to the State Parcel 9 and recognized that the City was authorized to make such conveyance pursuant to R.I.G.L. § 45–24.4–21. The City Council expressly "ratified, confirmed, and approved" this conveyance of real property to the State.

### C) C.A. Nos. 97–4199 and 98–5202: Reassessment of Back Taxes

In another matter of this litigation, on August 27, 1997, and on October 16, 1998, CPI filed C.A. Nos. 97–4199 and 98–5202,

respectively, seeking equitable relief against the City under R.I.G.L. §§ 44–5–26 and 44–5–27. CPI asserts that the City violated R.I.G.L. §§ 44–5–4, 44–5–11, and 44–5–15, 44–5–23, and 44–5–24 by revaluing and reassessing CPI's real property in the Capital Center District[1] (property) for years 1991 to 1996 and 1997,[2] and retroactively applying a property tax and accrued interest based upon the $110.00 per square foot real property fair market value determination in C.A. No. 88–1654. CPI has moved for summary judgment. The City has opposed this motion, arguing that CPI's property in the Capital Center District was erroneously assessed with a lower value than the fair market value determined by the Court in the above condemnation proceeding and asserts that CPI is judicially estopped from asserting that its other property has a lower fair market value per square foot. The City also has made a motion to sever the assessment for year 1996 from the reassessment for years 1991 to 1995. Additionally, in order to collect the alleged back taxes and accrued interest owed by CPI, the City has given CPI Tax Sale Notices, dated January 28, 1999, that state, in pertinent part, "the Real Estate in the City [ ] assessed in your name on December 31, 1997 and prior will be offered for Tax Sale at Public Auction on June 3, 1999."

After thorough examination of the evidence presented and factual proffers made by the parties, the Court finds the following undisputed facts. A general revaluation of all real property located in the City was conducted, as of December 31, 1987, by the Saber System Company. The Saber System Company developed a statistical computer model utilizing "pricing keys" to produce a fair and equitable valuation of all real property located in the City. On or about August 5, 1997, CPI received tax bills from the City for taxes assessed on

---

**1.** The real property owned by CPI subject to this litigation are parcels delineated as: Assessor's Plat No. 19, Lot Nos. 102, 103, 105, 109, 113, 114, 118, 119; and Assessor's Plat No. 4, Lot Nos. 247 and 252.

**2.** The Court notes that counsel, in their memoranda, interchange the tax year with the annual billing year.

CPI's property as of December 31, 1996. These tax bills reflected a remarkable increase in the valuations of the property.[3] The City essentially revalued CPI's property solely based upon the $110.00 per square foot condemnation value determined by the Court in C.A. No. 88–1654. It is undisputed that after the tax assessor learned of this determination he "felt compelled" to raise the valuations of CPI's other property to this level. The tax assessor reasoned that the previous valuations must have been "erroneous" because the Superior Court determined a condemnation fair market value per square foot that was greater than the assessed values of other property located in the Capital Center District.

On or about August 20, 1997, the City mailed additional tax bills to CPI. The City retroactively applied the real property valuations made in 1997 to taxes assessed for years 1991 to 1995 and assessed back taxes and accrued interest. Moreover, these same reassessment values were carried forward to the real property assessment as of December 31, 1997. There is no dispute between the parties that CPI has paid all taxes due on the property up to and including taxes assessed as of December 31, 1995.

### D) C.A. No. 98–6254: Condemnation of Parcel 9

On December 16, 1998, CPI filed C.A. No. 98–6254, alleging violation of the Redevelopment Act of 1956, Title 45, Chapters 31 to 33 (Redevelopment Act), in opposing the condemnation of Parcel 9 by the City. CPI moves for summary judgment arguing that Parcel 9 is not a blighted and substandard area as defined by the Redevelopment Act and that the City Council did not make the required findings of fact to support condemnation of Parcel 9. The

City argues that the above motion is not proper as there are genuine issues of material fact in dispute concerning the development of Parcel 9. The City asserts summarily, with no supporting documentation, that the facts concerning the development of Parcel 9 are in dispute as the factual findings of the City Council disagree with the factual proffers made by CPI.

After thorough examination of the facts proffered and consideration of the arguments presented in memoranda, this Court makes the following undisputed findings. In August 1998, the Providence Redevelopment Agency (PRA) submitted to the City Council an ordinance to amend the Official Redevelopment Plan for Downtown Providence Renewal (Amendment). This Amendment authorizes the PRA to condemn Parcel 9 and a portion of Parcel 15. The PRA submitted a written report with the Amendment. This report made "Findings as to Dangers from Arrested Development" and states, in pertinent part at page 5, that

[p]ursuant to RIGL Sec. 45–31–3, it is hereby established that the properties proposed to be acquired within both Parcels 9 and 15 are found to be arrested and that the vacant lots contribute to the substandard conditions in the area. Parcel 9 is a more precarious position than any other parcel in Capital Center. Its location is the gateway to Downtown; it is positioned at the crossroads of Memorial Boulevard, I–95 and Francis Street. Its lack of development proposals is surprising, given that this premier site will command views of Waterplace Park, the State House, College Hill and Downtown. A vacant Parcel in such close proximity to Waterplace Park hinders access to the Park and retards further development around Waterplace Park.

---

3. The per square foot valuation increase is as follows: Assessor's Plat No. 19, Lot 102—$30.00 to $110.00, Lots 103, 105, 113, 114, 118, 119—$75.00 to $110.00, and Lot 109—$18.75 to $110.00; Assessor's Plat No. 4, Lot 247 (246,037 sq. ft.)—$20.00 to $110.00 and (30,000 sq. ft.)—$2.00 to $10.00, and Lot 252—$5.00 to $75.00.

On or about September 3, 1998, the City Council referred the Amendment to the Committee on Urban Redevelopment, Renewal and Planning (Committee). On September 28, 1998, the Committee held a hearing concerning the Amendment and development of Parcel 9. During this hearing, CPI represented that it had secured a letter of intent for the "substantial" development of Parcel 9. CPI also represented that it "anticipates" the execution of a "definitive lease agreement shortly." However, on November 19, 1998 and December 3, 1998, the Amendment was read and passed in the City Council. The Mayor of the City (Mayor) signed the Amendment on December 14, 1998.

On December 2, 1998, CPI entered into a one hundred and forty-nine year lease agreement with FC Acquisition Associates, LLC (FC Associates), a national real estate company and an affiliate of Forest City Enterprises, Inc., for the development of Parcel 9. Under this lease agreement, FC Associates is required to construct a building with at least three hundred and fifty thousand square feet of commercial space with a minimum of two hundred parking spaces. This Court takes notice that, most recently, in an article entitled "Developer Plans Retail Complex at Cap Center," *The Providence Journal* newspaper outlined this development project as a "$50–million six-story retail development" that "would feature record and book stores and other entertainment offerings on the first floor, more traditional retail outlets above and parking space for 300 cars atop the structure." *See* Bob Wyss, *Developer Plans Retail Complex at Cap* Center, THE PROVIDENCE JOURNAL, March 27, 1999, also available at *www.projo.com/ report/pjb/ stories/01932841. htm.* Additionally, the Mayor, in publicly "announcing the new development," is quoted by *The Providence Journal* as saying Parcel 9 is "probably one of the most prominent addresses in the City of Providence." *Id.* These facts are not disputed by the City.

However, the City does dispute as a genuine issue of material fact the ownership of Parcel 9. As stated above in C.A. No. 98–2525, on July 7, 1989, the City transferred Parcel 9 by Deed to the State, and on September 13, 1989, the State conveyed Parcel 9 to CPI.[4] As part of an agreement between the State and CPI, approximately from September 1989 to December 1994, CPI permitted the State to use Parcel 9 for the storage of large granite blocks that were used to construct the Providence River Relocation Project. In exchange for the use of Parcel 9, the State agreed to pay the real estate taxes of Parcel 9 due to the City.[5]

### *SUMMARY JUDGMENT REVIEW*

■ "Summary judgment is a proceeding in which the proponent must demonstrate ... that he or she is entitled to judgment as a matter of law and that there are no genuine issues of material fact." *Palmisciano v. Burrillville Racing Association,* 603 A.2d 317, 320 (R.I.1992) (citing *Steinberg v. State,* 427 A.2d 338 (R.I.1981); *Ludwig v. Kowal,* 419 A.2d 297 (R.I.1980)); Super.Ct.R.Civ.P. Rule 56(c). During a summary judgment proceeding "the court does not pass upon the weight or credibility of the evidence but must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." *Id.* (citing *Lennon v. MacGregor,* 423 A.2d 820 (R.I.1980)). Moreover,

---

4. The City argues that a genuine issue of material fact is whether the City owns Parcel 9 and summary judgment is precluded until that issue is determined in C.A. No. 98–2525. This Court does not agree. This Court need not determine the ownership of Parcel 9 before it considers, as a matter of law, whether the actions of the City Council comply with the Redevelopment Act. The ownership of Parcel 9 is addressed below in C.A. No. 98–2525.

5. No party has raised arguments concerning the liability of the State pursuant to this agreement to pay either CPI or the City the claimed amounts for reassessed back taxes and accrued interest.

"the trial justice must look for factual issues, not determine them. The justice's only function is to determine whether there are any issues involving material facts." *Id.* (quoting *Steinberg v. State, supra* at 340). The Court's purpose during the summary judgment procedure is issue finding, not issue determination. *Industrial National Bank v. Peloso,* 121 R.I. 305, 307, 397 A.2d 1312, 1313 (R.I.1979) (citing *O'Connor v. McKanna,* 116 R.I. 627, 359 A.2d 350 (R.I.1976); *Slefkin v. Tarkomian,* 103 R.I. 495, 238 A.2d 742 (R.I.1968)). Thus, the only task of a trial justice in ruling on a summary judgment motion is to determine whether there is a genuine issue concerning any material fact. *Id.* (citing *Rhode Island Hospital Trust National Bank v. Boiteau,* 119 R.I. 64, 376 A.2d 323 (R.I.1977)).

 "When an examination of the pleadings, affidavits, admissions, answers to interrogatories and other similar matters, viewed in the light most favorable to the party opposing the motion, reveals no such issue, the suit is ripe for summary judgment." *Id.* (citing *Rhode Island Hospital Trust National Bank v. Boiteau, supra; O'Connor v. McKanna, supra*). "[T]he opposing parties will not be allowed to rely upon mere allegations or denials in their pleadings. Rather, by affidavits or otherwise they have an affirmative duty to set forth specific fact showing that there is a genuine issue of material fact." *Bourg v. Bristol Boat Co.,* 705 A.2d 969 (R.I.1998) (citing *St. Paul Fire & Marine Insurance Co. v. Russo Brothers, Inc.,* 641 A.2d 1297, 1299 (R.I.1994); Super.Ct.R.Civ.P. Rule 56(e)). However, it is not an absolute requirement that the nonmoving party file an affidavit in opposition to the motion. *Steinberg v. State, supra.* If the affidavit of the moving party does not establish the absence of a material factual issue, the trial justice should deny the motion despite the failure of the nonmoving party to file a counter-affidavit. *Id.*

## ANALYSIS

### A) C.A. No. 98–2525: Declaratory Judgment

#### 1) *Declaratory Judgment Standard*

 Under the Uniform Declaratory Judgment Act, this Court "shall have the power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." R.I.G.L. § 9–30–1. The purpose of this Act "is to facilitate the termination of controversies." *Fireman's Fund Ins. Co. v. E.W. Burman, Inc.,* 120 R.I. 841, 845, 391 A.2d 99, 101 (R.I.1978) (citations omitted). This Court may also grant further affirmative relief based on the declaratory judgment "whenever necessary or proper" provided subsequent "supplementary proceedings" are brought pursuant thereto. R.I.G.L. §§ 9–30–8 and 9–30–12; *Sousa v. Langlois,* 97 R.I. 196, 196 A.2d 838 (1964). These claims for affirmative relief, such as those for money damages, may be joined to the declaratory judgment action pursuant to "the liberal provisions of Rule 18 of the Superior Court Rules of Civil Procedure ." *Chase v. Mousseau,* 448 A.2d 1221, 1224 (R.I.1982) (citing *Duffy v. Mollo,* 121 R.I. 480, 400 A.2d 263, 267 (1979); 1 Kent, *R.I.Civ.Prac.,* § 57.3 at 428 (1969)). This joinder is also supported by "the 'substantial justice' guideline of Super.R.Civ.P. 8(f)" that states "all pleadings shall be so construed as to do substantial justice." *Id.* at 1224–1225.

#### 2) State is a Proper Party Plaintiff to Seek Relief Pursuant to R.I.G.L § 9–30–1

 The City argues that the Uniform Declaratory Judgment Act (Act) does not confer jurisdiction upon this Court to hear a complaint brought by the State. Relying on *Rhode Island Turnpike and Bridge Authority v. Nugent,* 95 R.I. 19, 182 A.2d 427 (1962), the City asserts that the State is not a "person" as defined by R.I.G.L. § 9–30–13 and, thus, cannot seek relief under the Act. "Obviously, state offi-

cials are literally persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from suit against the State itself." *Will v. Michigan,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989) (citations omitted). This Court agrees with the City that under the general rules of statutory construction "neither the State nor its officials acting in their official capacities are 'persons'" included in the definition of "persons" as defined in R.I.G.L. § 9–30–13. *Id.*

■ However, R.I.G.L. § 9–30–1 does not limit declaratory relief to "persons" as defined by the Act. The term "person" is used in R.I.G.L. §§ 9–30–2 "Power to construe," 9–30–3 Construction of contracts", and 9–30–4 "Fiduciaries and other persons entitled to declaration of rights." The Legislature recognized that the "enumerations" contained in the above sections "do not limit or restrict the exercise of the general powers conferred in R.I.G.L. § 9–30–1, in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty." R.I.G.L. § 9–30–5. This Court finds that a declaratory determination of the contractual obligations of the parties will terminate this aspect of the controversy. Moreover, our Supreme Court recognized, in *Rhode Island Turnpike and Bridge Authority v. Nugent,* 95 R.I. at 29, 182 A.2d at 432, that the State may consent to be sued, and thus waive any sovereign immunity from judicial review under the Act. Additionally, "[i]t has been determined that public officers are entitled to have their legal duties determined judicially by action for declaratory judgment. I Anderson, *Declaratory Judgments* (1951), sec. 159, p. 307. And it has stated that the 'state itself and its political subdivisions ... are proper parties plaintiff.'" Borchard, *Declaratory Judgments* (1941), pp. 264." *Abbott v. Beth Israel Cemetery Ass'n,* 13 N.J. 528,

100 A.2d 532, 538 (1953) (citations omitted). This Court concludes that the State has brought this action under the Act and, thus, has waived sovereign immunity. Therefore, this Court has jurisdiction to decide this matter pursuant to R.I.G.L. § 9–30–1. ·

### 3) State is Contractually Bound to Pay the Final Judgment to CPI

■ This jurisdiction has "long [] held that 'parties are bound by the plain terms of their contract.'" *Vincent Co. v. First Nat. Supermarkets, Inc.,* 683 A.2d 361, 363 (R.I.1996) (quoting *Hiller v. Submarine Signal Co.,* 325 Mass. 546, 550, 91 N.E.2d 667, 669 (1950)). "The main objective of the [C]ourt when construing contract terms is to determine the intent of the parties." *Johnson v. Western Nat. Life Ins., Co.,* 641 A.2d 47, 48 (R.I.1994) (citations omitted). The Court will enforce the intentions of the parties as manifested in the terms of the contract if those "intention[s] can be clearly inferred from [the contract] terms and can be fairly carried out consistent with settled rules of law." *Hill v. M.S. Alper & Son, Inc.,* 106 R.I. 38, 47, 256 A.2d 10, 15 (1969) (citations omitted). Moreover, the Court "must find that a contract is ambiguous before it can exercise judicial construction of the document. If the [C]ourt finds that the terms of an agreement are clear and unambiguous, the task of judicial construction is at an end and the agreement must be applied as written." *W.P. Associates v. Forcier, Inc.,* 637 A.2d 353, 356 (R.I.1994).

After review of the facts and consideration of the arguments presented, this Court finds that there are no genuine issues of material fact in dispute between the parties. From thorough consideration of the CPI–State Agreement, the Preliminary Agreement, and the State–City Agreement, and after giving the "word their plain, ordinary, and usual meaning" the Court finds that the relevant terms and provisions of the these agreements are clear and unambiguous. *Johnson v. West-*

*ern Nat. Life Ins.*, 641 A.2d at 48. Paragraph 4 of the CPI–State Agreement clearly states that "[CPI] will pay to the State a sum equal to the State's share of the total condemnation proceeds awarded [CPI].... The balance of the condemnation proceeds shall remain the property of [CPI]." In order for CPI to pay the State a portion of the total condemnation proceeds awarded in the Final Judgment and retain the balance, CPI must first receive payment of the Final Judgment from the State. Although the CPI–State Agreement contemplated that "the State and the City will be sharing the costs of condemnation ...," this language does not release the State from paying the Final Judgment to CPI. The CPI–State Agreement specifically states that "[this release] shall not extend to condemnation payments under Paragraphs 1 and 6 hereof." The Final Judgment for condemnation damages was awarded to CPI against the State, and only the State. The Court concludes that the State is the judgment debtor and CPI has a clear legal right to payment by the State. The State has not submitted sufficient evidence for this Court to find that it is has any contractual defenses to the execution of the Writ of Mandamus. After thorough consideration of the above findings of fact and conclusions of law, this Court concludes that the Writ of Mandamus issued in the *Decision by Justice Dominic F. Cresto*, No. PC 88–1654, *supra* is proper and should so issue. Therefore, this Court denies the State's motion for summary judgment with prejudice and grants the motion for summary judgment filed by CPI.

### 4) The City Owes the State One Half the Final Judgment

"Contracts with municipalities are measured by the same tests and are subject to the same rights and liabilities as are other contracts." *City of Warwick v. Boeng Corp.*, 472 A.2d 1214, 1217 (R.I. 1984) (citing 10 McQuillin *Municipal Cor-*

*porations* § 29.124 at 560 (3d. rev. ed.1981)). From the undisputed facts, this Court finds that a valid contract was executed between the State and the City. The City claims, however, that the State–City Agreement is void and unenforceable for lack of City Council authorization. To conclude whether the State–City Agreement is void, this Court must first determine 1) whether the City was "acting within its general corporate powers, but the particular act is void on account of some defect in the execution of the power" or 2) whether the City's "act in question is void because it is entirely beyond its corporate powers under any circumstances." *Newport Hospital v. Ward*, 183 A. 571, 577, 56 R.I. 45, 59 (1936). Although the City does not make this distinction in their argument, this determination is significant because "[i]n cases of the former class, the municipality is generally held liable for such benefits as it may have received in the course of the transaction, while, in cases of the latter class, no recovery is permitted from the municipality for the value of the benefits received." *Id.* (citations omitted).

Our Supreme Court has recognized that "a city may enter into contracts in aid of the performance of its public duties" *Xavier v. Cianci*, 479 A.2d 1179, 1182 (R.I.1984) (citing 10 McQuillin *Municipal Corporations* § 29.08 at 234 (3d. ed.1981)), and "a party who has received the benefit of the performance of a contract will not be permitted to deny his or her obligations unless paramount public interest requires." *City of Warwick v. Boeng Corp.*, 472 A.2d at 1218. The City has not submitted any genuine issue of material fact concerning the validity or enforceability of either the Preliminary Agreement or the State–City Agreement. The City has neither proffered facts to dispute that the City Council, in issuing Resolution No. 177, authorized the Mayor "to execute an agreement ... with the State ... regarding the Memorial Boulevard Extension Project" nor presented argument that Mayor's actions of executing the Preliminary Agreement

and State–City Agreement are ultra vires and not within the general corporate powers of the City. From the undisputed facts presented, this Court finds that the Mayor first executed the Preliminary Agreement and then executed the State–City Agreement. After thorough review of these writings, this Court finds that the relevant terms and provisions of these writings are clear and unambiguous and are not in conflict with each other. This Court concludes that the City Council, in issuing Resolution Nos. 177 and 472, expressly authorized the Mayor to execute these agreements, and that the City Council officially ratified the actions of the Mayor by issuing these Resolutions. Specifically, in Resolution No. 472, the City Council acknowledged and ratified the actual authority of the Mayor to execute such agreements pursuant to Resolution No. 177.

Moreover, the City neither proffers facts nor makes any argument that it has contested the validity and enforceability of the Preliminary Agreement and State–City Agreement prior to being confronted with the potential liability of paying its share of the Final Judgment. This Court notes that, from the time the Mayor executed these agreements until the start of this litigation, the City has received many benefits from the substantial commercial and infrastructure development in the City associated with the Preliminary Agreement, the State–City Agreement, and the Providence River Relocation Project. The Court finds that in receiving these benefits while maintaining its silence, the City, namely, the City Council, has ratified the Preliminary Agreement and the State–City Agreement. Moreover, the actions by the City Council in issuing Resolutions Nos. 177 and 472, and the inaction by the City Council in maintaining silence while receiving substantial benefits from these two agreements with the State, illustrate to this Court that the Mayor had the requisite actual authority from the City Council to execute such agreements on behalf of the City. *See School Committee of City of Providence v. Board of Regents for Ed.,* 429 A.2d 1297, 1302 (R.I.1981) (The "authority of a public agent to bind a municipality must be actual.").

The determination of this Court, interpreting the CPI–State Agreement, that the State is contractually bound to pay CPI the Final Judgment, additionally is supported by the State–City Agreement. The parties do not dispute the documentary evidence illustrating that the State and the City agreed to share equally the "land acquisition expenses" and payment of "judgments" incurred by the State "arising out of any litigation...." Specifically, the State–City Agreement, Section 308, subsection (a), states that **the City agreed to make payments in cash *to the State* of its financial obligations.** (Emphasis added). The State's argument that the City is contractually obligated to pay one-half the Final Judgment to CPI is not supported by the clear and unambiguous language of the State–City Agreement. Final judgment has been entered in C.A. No. 88–1654, and despite the State's contrary position, the Court finds that the City is contractually obligated to pay the State its one-half share of this amount. Therefore, the Court grants the 'conditional' motion for summary judgment by the State against the City and upon subsequent "supplementary proceedings" before this Court, the Court will grant the State affirmative relief against the City in accordance herewith.

### 5) CPI is the Owner in Fee of Parcel 9

The City has presented no genuine issues of material fact that the conveyance of Parcel 9 from the City to the State is void. It is undisputed that the City Council issued Resolution Nos. 177 and 472 approving the Preliminary Agreement and State–City Agreement, and, thus, the conveyance of Parcel 9 to the State. Moreover, from the clear and unambiguous language contained in Resolution No.

472, this Court finds that the City Council "authorized [the Mayor] to convey to the State .. said Parcel 9...." The City Council also recognized in Resolution No. 472 the general corporate authority of the City to convey Parcel 9 pursuant to R.I.G.L. § 45–24.4–21 and then "ratified, confirmed, and approved" said conveyance to the State. The City presents neither sufficient facts nor argument that the conveyance of Parcel 9 does not come within the corporate authority of the City pursuant to R.I.G.L. § 45–24.4–21. The Court also finds that the City has neither presented sufficient facts nor argument for this Court to conclude that the action of the City in conveying Parcel 9 to the State was ultra vires. The Court concludes that the City Council authorized the Mayor to convey Parcel 9 to the State and officially "ratified, confirmed, and approved" said conveyance of real property. Moreover, this Court finds that the State then conveyed Parcel 9 to CPI, and concludes that CPI is the owner in fee of Parcel 9. Therefore, the motion for summary judgment by CPI against the City is granted.

### B) C.A. No. 97–4199 and 98–5202: Reassessment of Back Taxes

#### 1) *Standard of Review*

"The relief which the Legislature provided for in [R.I.G.L.] § 44–5–26 is the exclusive remedy available for relief from an alleged illegal assessment of taxes." *S.S. Kresge Co. v. Bouchard,* 111 R.I. 685, 689, 306 A.2d 179, 181 (1973) (citing *Murray v. Rockaway Boulevard Wrecking & Lumber Co.,* 108 R.I. 607, 277 A.2d 922 (1971)). "Because revaluations must be carried out in an acceptable and orderly manner, selective assessments are generally held unlawful as discriminatory against the complaining taxpayer. An illegal assessment also has been found to exist where a different method of appraising land values was applied to a small number of properties within a county." *Picerne v. DiPrete,* 428 A.2d 1074, 1077

(R.I.1981) (citations omitted); *see also Picerne v. DiPrete,* 542 A.2d 1101 (R.I.1988). It is not "illegal per se or violative of constitutional uniformity or equal-protection provisions" when the tax authorities correct "past inequities without a general revaluation.... But when the tax authorities act out of improper or discriminatory motives, the legitimacy of the revaluation process ends." *Id.* at 1078. The "appropriate" remedy to cure this violation is for the trial justice to "order[ ] the defendants to expunge the [ ] reassessments and permanently enjoin[ ] the defendants from collecting taxes based on these reassessments." *Id.* at 1078–1079 (citations omitted). This Court is

> [m]indful of th[e] [Supreme] [C]ourt's mandate that 'taxing statutes are to be strictly construed' with doubts resolved in favor of the taxpayer.... 'Assessment proper includes valuation but valuation alone is not the assessment but instead only its most important element.' 3 Cooley, *The Law of Taxation* § 1044 at 2114 (4th ed. 1924).... [T]he term 'assessment' as used in our taxing statutes carries with it a variety of meanings and noting also the statutory language before us, to wit, '[a]ny person aggrieved on any ground whatsoever by any assessment of taxes ...,' we have no hesitancy in holding that within the context of [R.I.G.L.] § 44–5–26 the term 'assessment' refers to the entire plan or statutory scheme for the imposition and collection of taxes, including the calculation of the rate.

*Maggiacomo v. DiVincenzo,* 122 R.I. 615, 618, 410 A.2d 1332, 1333–1334 (1980) (citations omitted). Moreover, "tax assessments that are made outside the ambit of state law are illegal, regardless of whether identifiable and accepted methods of appraisal are used." *Inn Group Associates v. Booth,* 593 A.2d 49, 51 (R.I.1991).

#### 2) The Complaint Filed by CPI is Proper

The City argues that CPI must file a complaint for each of the tax

years CPI is contesting the reassessment and imposition of back taxes and accrued interest. This Court does not agree. Generally, "a taxpayer who challenges an assessment must file a complaint for each tax year that an assessment is under challenge." *McKee v. Bouchard*, 674 A.2d 378, 380 (R.I.1996) (citing *Northgate Associates v. Shorey*, 541 A.2d 1192 (R.I.1988)). However, our Supreme Court has recognized that a plaintiff is not required "to relitigate annually the issue of fair market value" once this Court has found an assessment to be invalid. *Ferland Corp. v. Bouchard*, 626 A.2d 210, 216 (R.I.1993) (citing *Rhode Island Student Loan Authority v. NELS, Inc.*, 600 A.2d 717, 720 (R.I.1991)). The City conducted a tax assessment and retroactive reassessment in 1997, and a tax assessment in 1998 of CPI's properties. The matter before the Court is whether the tax assessment of CPI's real property, and retrospective application thereof, utilizing the fair market value per square foot determined by the Superior Court in C.A. No. 88–1654, violates the general laws. Once this Court determines this issue, there will be no need for CPI to file a separate complaint for each tax year it is contesting as any ruling the Court makes will apply to all tax years in question. *Ferland Corp. v. Bouchard, supra.* Therefore, from the above findings of fact and conclusions of law, this Court denies the City's motion to sever.

### 3) The Tax Reassessments by the City are Selective, Arbitrary, and Illegal

 After review of the factual proffers and arguments made by counsel, this Court finds that there are no genuine issues of material fact in dispute between the parties. In the absence of precedential decisions on a particular matter the Court may look to the cases from other jurisdictions which have considered the issue. *Merlino v. Tax Assessors for the Town of North Providence*, 114 R.I. 630,

639, 337 A.2d 796, 802 (1975) (footnote omitted). As counsel for CPI has argued, other Courts have determined that the term "omitted property" as applied in the tax statutes means property that the tax assessor has not assessed at all and does not mean property that the tax assessor has undervalued. *Hunt v. Dist. of Columbia*, 108 F.2d 10, 13 (D.C.Cir.1939); *See also Dist. of Columbia v. Casino Assocs., Ltd.*, 684 A.2d 322 (D.C.1996); *Enterprise Prods. Co. v. Bd. of Supervisors*, 729 So.2d 790 (1998). Additionally, the term "erroneous assessment" is defined as "an assessment that deviates from the law and is therefore invalid, and is a defect that is jurisdictional in its nature, and does not refer to the judgment of the assessing officer in fixing the amount of valuation of the property." *Black's Law Dictionary* (6th Ed.) (citing *In re Blatt*, 41 N.M. 269, 67 P.2d 293, 301 (1937)); *see also Rosewell v. Bulk Terminals Co.*, 73 Ill.App.3d 225, 28 Ill.Dec. 704, 390 N.E.2d 1294 (1979).

The City reassessed and imposed back taxes and accrued interest on CPI's property solely based upon the condemnation value of one other piece of real property as determined by the Superior Court in a condemnation action. This fact is not disputed by the evidentiary proffers made by the parties. The City valuing real property for tax assessment purposes lower than the fair market value of other real property as later determined by the Superior Court in a future condemnation proceeding does not qualify as an "omitted" or "erroneous" assessment as required by the statute. This Court concludes that the tax assessments were neither "omitted in the assessment" nor "erroneously assessed" to comply with the requirements of R.I.G.L. § 44–5–23.

 Moreover, this Court finds the tax assessments made by the City against CPI to be selective, arbitrary, and illegal.

From the factual proffers provided by the parties, the Court concludes that the City intended to revalue only CPI's property in the Capital Center District.[6] The tax assessments and reassessments were not made by the tax assessor as part of a "definite and logical plan for all properties in the" City, but rather were based upon the fair market value of different real property in the Capital Center District as determined by the Superior Court in a condemnation proceeding.[7] *See Picerne v. DiPrete*, 428 A.2d at 1078. The City's real property valuation method of utilizing the fair market value of real property as determined by the Superior Court in a condemnation proceeding to determine the fair market value of other real property for tax assessment and reassessment purposes is selective, arbitrary, and illegal. Therefore, this Court grants the motion for summary judgment filed by CPI against the City. This Court hereby orders the City to expunge all real property tax assessments and reassessments based upon the $110.00 per square foot fair market value as determined in the condemnation proceeding above and permanently enjoins the City from collecting taxes and accrued interest based upon this assessment and reassessment valuation method. *Id.*

6. The Court notes that other owners of real property located in the Capital Center District also may have been assessed real estate taxes solely based upon the $110.00 per square foot fair market value determination of the Superior Court; however, the parties do not present sufficient facts to support such a conclusion. This Court concludes that such factual proffers would not change the legal determinations contained herein.

7. The issue before the Court is not whether the tax assessor calculated the proper fair market value of CPI's real property in the Capital Center District, but whether the tax assessor's valuation method—the fair market value for condemnation of other real property as determined by the Superior Court—for reassessing real property that the City already had assessed is proper. This Court distin-

### C) C.A. No. 98–6254: Condemnation of Parcel 9

### 1) Standard to Condemn Real Property

The purpose of the Redevelopment Act is the "elimination and prevention of blighted and substandard areas and their replacement through redevelopment by well-planned, integrated, stable, safe, and healthful neighborhoods...." R.I.G.L. § 45–31–7. An arrested blighted area is defined as "an area, which, by reason of the existence of physical conditions ... is unduly costly to develop soundly through the ordinary operations of private enterprise and impairs the sound growth of the community." R.I.G.L. § 45–31–8. This Court is "[c]onscious ... of the extreme grant of power now resting in the hands of various redevelopment agencies ... [and] that a showing that a redevelopment agency has exceeded its delegated authority by an arbitrary, capricious or bad faith taking of private property is a matter properly cognizable by the judicial branch." *Romeo v. Cranston Redevelopment Agency*, 105 R.I. 651, 665, 254 A.2d 426, 434 (1969) (citations omitted). Additionally, pursuant to R.I.G.L. § 45–32–20, the PRA, and subsequently the City Council, in adopting the ordinance was required to make "findings that the project area is blighted and substandard and requires ... redevelopment."

guishes the present issue from that presented by the parties in *Nos Ltd. Partnership v. Booth*, 654 A.2d 308 (R.I.1995). The case action between CPI and the City is not a dispute over the fair market value of the individual properties. In fact, the City has not "assessed" the fair market value of CPI's properties utilizing a recognized valuation model to produce a fair and equitable valuation of all real property located in the City. This Court doubts that if the Superior Court, in the condemnation proceeding above, determined a fair market value per square foot less than the assessed values of real property in the Capital Center District that the City would have "felt compelled" to issue a tax refund and pay accrued interest to CPI for overpayment of taxes during the prior six years.

### 2) Condemnation of Parcel 9 Violates the Redevelopment Act

CPI has proffered undisputed facts that Parcel 9 is scheduled for "substantial" commercial development which will benefit the local community, the City, and the State. At the September 28, 1998, hearing before the Committee, CPI made this fact known to the City. However, with the knowledge that CPI would execute a "definitive lease agreement" for Parcel 9 with a real estate developer, the City Council adopted and the Mayor signed the ordinance condemning Parcel 9. Neither the PRA nor the City Council made the requisite findings of fact to support a conclusion that Parcel 9 is a "blighted and substandard area" and "requires" redevelopment by the City. *See* R.I.G.L. § 45–32–20. After consideration of the undisputed factual proffers made by the parties, this Court concludes that this act by the City Council and the Mayor was arbitrary, capricious, and done in bad faith. Moreover, this Court takes notice that as the City contests this summary judgment motion arguing to this Court that there are disputed facts whether CPI is developing Parcel 9, the Mayor was very willing to announce publicly the commercial development of Parcel 9 and to unveil an "artist's rendering of the project." Bob Wyss, *Developer Plan Retail Complex at Cap Center*, THE PROVIDENCE JOURNAL, *supra*. Therefore, this Court finds that there are no genuine issues of material fact as to the condemnation of Parcel 9 by the PRA and the City Council, and hereby grants the motion for summary judgment filed by CPI.

### CONCLUSION

The Supreme Court deferred consideration of No. 98–394–Appeal and "remand[ed] [that] case to [this Court] with [the] direction to consolidate, hear, and decide" all unresolved claims and defenses among the parties. *See Appendix A*. Pursuant to the remand Order issued in that appeal, this Court has consolidated, heard, and decided the above case actions. The parties have submitted various summary judgment motions and accompanying memoranda of law. After thorough review of the factual proffers made and consideration of the memoranda of law submitted by the parties, this Court finds in each case action that there are no genuine issues of material fact in dispute between the parties. This Court provided all parties with an equal, and more than ample, opportunity to comply with the above Supreme Court Order. The Court granted a flexible and lengthy briefing schedule for the parties to submit memoranda, and supplementary memoranda, of law and to provide accompanying evidentiary proffers in order to ensure that this Court have before it all unresolved claims and defenses, and to ensure for each party a full opportunity to be heard by this Court. Although the parties did not present oral arguments concerning the above matters, this Court concludes that the rights of the parties were not prejudiced as the aforesaid briefing schedule ensured that each party had an equal, and more than ample, opportunity to proffer facts and make arguments of law before this Court.

After filing this Decision with the Clerk of the Superior Court, this Court sua sponte will enter the appropriate judgments in accordance herewith for the above case actions, and shall submit all case files herein to the Supreme Court forthwith. This Court takes notice that these case actions are proceeding directly to the Supreme Court and that the appeal procedures under our general laws and civil rules for the parties to seek review of this Decision by our Supreme Court have been stayed. After thoughtful consideration, this Court concludes that neither the appeal rights nor the constitutional rights of the parties have been substantially prejudiced. The appeal rights of the parties are preserved, so this procedural irregularity does not prevent any party from appealing either this Decision or the judgments contained herein to our Supreme

Court. This Court orders that the above matters, which have been consolidated, heard, and decided, before this Court, as so ordered by our Supreme Court, shall remain consolidated and shall proceed to the Supreme Court without further delay.