JOHN UCCELLO *vs.* GOLD'N FOODS, INC. & others.

Suffolk. October 7, 1949. — February 8, 1950.

Present: QUA, C.J., RONAN, WILKINS, SPALDING, & COUNIHAN, JJ.

*Corporation,* Officers and agents, Stockholder. *Negligence,* Officer of corporation. *Estoppel. Words,* "Estopped."

Findings by a trial judge respecting a corporation engaged in manufacturing dressings for foodstuffs in the face of adverse postwar conditions did not show "clear and gross negligence" on the part of its directors and managing officers in not terminating its operations sooner than they were terminated in 1947.

Payment of a reasonable salary for services as a superintendent rendered to a corporation with the expectation of both the superintendent and the corporation that payment would be made therefor was not barred by the fact that the superintendent was a director of the corporation or by the fact that his salary was not shown by formal votes spread on the corporate records.

A stockholder of a corporation, by reason of his acquiescence in, approval of and participation in a practice whereby stockholders received payments from the corporation ostensibly as salaries but really as divisions of profits according to their stock holdings without proper corporate authorization, was estopped to maintain a minority stockholder's suit based on payments of that character received by individual defendants.

BILL IN EQUITY, filed in the Superior Court on May 5, 1948.

The suit was heard by *Brogna,* J.

*J. G. Kelly,* (*S. A. Valenti* with him,) for the plaintiff.

*J. F. Groden,* (*C. C. Worth* with him,) for the defendants.

WILKINS, J. This minority stockholder's bill against a Massachusetts business corporation and three officers and directors seeks damages for mismanagement and restoration of sums paid as salaries to the individual defendants. From a decree dismissing the bill the plaintiff appealed. The judge made a report of the material facts found by him, which, although voluntary, was apparently intended to include all facts necessary for the determination of the issues. Later on motion of the plaintiff and still later with the consent of the parties he respectively made two reports of additional material facts. We treat the three reports as having the same effect as a report under the statute. G. L. (Ter. Ed.) c. 214, § 23, as appearing in St. 1947, c. 365, § 2. *Goldston* v. *Randolph,* 293 Mass. 253, 255. The evidence is not reported.

The corporate defendant was organized in 1942, and during the period now material engaged in the manufacture of dressings for salads and for other foodstuffs. It sold mostly through brokers. Owing to the poor quality of ingredients obtainable it manufactured an inferior product which sold during wartime but not for long thereafter, and as a result it received numerous complaints and returns of merchandise. By July, 1947, the company's market was gone, and it ceased manufacturing. The defendant Soucy was treasurer and a director from February 13, 1943, and president from August 17, 1944, to October 17, 1944, and from January 15, 1946. He was the dominant figure in the

company and acted as a sort of general manager. He assumed the responsibility of deciding all major problems, lending large sums of money to the company and indorsing its notes at banks. "All its troubles and headaches were his." The defendant Brady became a director and a vice-president on October 17, 1944. He assisted in making contacts for sales, in finding and arranging for a new and suitable plant, in procuring equipment and machinery, in advising in setting up the plant with respect to productive efficiency, in obtaining materials for production, which were scarce and hard to obtain, and in many other ways. The defendant Grasso was elected vice-president on April 19, 1943, and director on August 17, 1944. From 1943 he served as superintendent of the company's plant, and was responsible for and in charge of all plant operations.

The plaintiff, a ventilating, plumbing, and heating contractor, was never an officer or director. As a contractor, he did some work at the company's plant in 1943, and he became a stockholder on May 31, 1944. He was employed on a salary in the spring of 1946 to set up machinery and equipment in the company's new plant and to make ready for operations. Thereafter he was employed as maintenance man.

1. On the issue of mismanagement the burden of proof is on the plaintiff to show want of good faith or failure to exercise reasonable intelligence. The officers of a business corporation, as distinguished from a banking corporation, are not responsible for mere errors of judgment or want of prudence short of "clear and gross negligence." *Spiegel* v. *Beacon Participations, Inc.* 297 Mass. 398, 410–412. *Murphy* v. *Hanlon,* 322 Mass. 683, 686.

The judge's findings do not assist the plaintiff in sustaining the burden of proof in either respect. The statement, "I do not find that in any of their dealings with the money or affairs of the company . . . anyone of the defendants was prompted by a dishonest purpose or with a consciousness of wrongdoing," is tantamount to an express finding of

failure to show want of good faith. The statement, "I do not find that their conduct was wanton or reckless or clearly and grossly negligent," is attacked as inconsistent with certain findings, which follow. "In the fall of 1946, it was becoming increasingly apparent that the company was facing serious trouble. The immediate postwar years had been very difficult; commodities had been rationed, machinery was on priority, and both were very scarce; oils, sugar, and starch could scarcely be obtained, and the company was obliged to choose between shutting down or using every possible means to get materials and equipment, and to use substitutes of a lower grade and quality as ingredients. . . . Because of inferior or inadequate ingredients used in the preparation and manufacture of its product it fermented and spoiled especially if it was not consumed soon after it was made; and would be more apt to spoil if subjected to unusual heat. Notwithstanding that it was an inferior product, it was usable and not harmful if used within a month or so after it was made and perhaps for a longer period if kept at favorable climatic temperatures. . . . The defendants knew while they were producing French dressings and salad dressings that they were doing it under unsatisfactory conditions and that the ingredients used were of inferior quality. They knew that some of it was spoiling, and that it would spoil unless used very soon after it was produced; and should have known that it probably would not stand the harmful effect of freight delays to distant destinations and continuous heat." We do not agree that these findings required a conclusion that the individual defendants' conduct amounted to "clear and gross negligence," or that it was a violation of the requisite standard of duty that they did not resolve the question, whether to continue to try to do the best possible under war conditions or to shut down, in favor of shutting down. There were other findings, too, which militate against the plaintiff's contention. It was found that the company's sales aggregated about $1,750,000; that about one fifth of the goods sold spoiled or was claimed to have spoiled; that the com-

pany took back goods or allowed credit to a total of only about $75,000; and that in doing so the individual defendants acted reasonably and did what they considered for the best interests of the company.

2. The judge found· that "the monies received by Soucy and Brady were not predicated upon fair and reasonable value of the services rendered, but upon the theory of income on their investment and the then ability of the company to pay a return on their investment." The company never declared a dividend, and no sums were voted to the individual defendants by way of salary. The judge stated, "Although I find that some of the things done by Soucy and Brady were of value to the corporation, I do not find that they were performed under such circumstances that an obligation on the part of the corporation to pay is shown to be implied." Soucy and Brady expected in some way to be compensated, but never consciously distinguished or considered whether what they were doing was being done in their capacity as stockholders or officers, or in some other relationship.

Prior to May 31, 1944, Soucy and one Ulin each owned one half the capital stock. On that date the old stock was retired, and five hundred shares of class "A" common at $1 par value with the only voting power were given to Soucy and to Ulin for the old stock. There were then authorized five hundred shares of class "B" common at $1 par value and five hundred shares of six per cent cumulative preferred at $100 par value, and there were then issued for cash the following amounts of class "B" common and of preferred: to Soucy one hundred seventy shares of each; to Ulin seventy-six shares of each; to the plaintiff twenty-five shares of each; to Grasso ten shares of each; and to one Selling, a food broker, ten shares of each. On August 16, 1944, Soucy purchased all of Ulin's stock for $12,440, and thus became the owner of all the voting stock. Soucy then interested Brady in the company. Soucy told Brady that if Brady purchased from Soucy seventy-six shares of preferred stock and two hundred sixty-four shares of the two classes of

common stock, and if Brady purchased twenty-one shares
of preferred stock from the company, he would then own
one third of the company and would have the option to buy
in the same ratio if additional treasury stock should be sold.
Soucy also told Brady that Soucy was drawing no salary;
that when Soucy should take a salary, Brady would be paid
a salary equal to one third of Soucy's salary; and that at
the next meeting Brady would be elected a director and vice-
president. On October 1, 1944, Brady bought the stock
from Soucy for $12,500, but not the additional shares from
the company. On October 17, 1944, at a stockholders'
meeting, a letter from Soucy confirming the agreement with
Brady's written acceptance was entered in the minutes, and
Brady was elected as agreed. This was the last discussion
about salaries or compensation to Soucy or Brady until a
meeting in January, 1947, when it was agreed to suspend
the payment of salaries to all stockholders except Grasso,
as will later appear. During the period of their agreement,
Soucy and Brady received money from the company at the
same ratio. In all Soucy received $26,250 as follows:
$4,400 in 1943, $5,250 in 1944, $6,600 in 1945, and $10,000
in 1946. In all Brady received $6,097.50 as follows: $507.50
in 1944, $2,260 in 1945, and $3,330 in 1946. The payments
to Soucy up to May 31, 1944, were made with the knowledge
and acquiescence of all the stockholders.

On March 20, 1946, all outstanding stock was retired, and
the company was authorized to issue ten thousand voting
shares without par value. Five shares were exchanged for
each share of preferred stock and one share for each share of
"A" or "B" common stock. On October 31, 1946, nine
hundred ninety-two shares were sold at $27, and on
March 19, 1947, one thousand six hundred thirty-two shares
were sold at $18. Thereafter the stockholdings were: Soucy,
two thousand four hundred twenty-seven, for which he paid
$40,473; Brady one thousand six hundred, for which he
paid $31,882; the plaintiff, as is hereinafter shown in detail,
one thousand twenty-six, for which he paid $22,480; one
Procter five hundred twenty-three, for which he paid

$10,219; and Grasso one hundred forty-two, for which he paid $3,224.

After Brady came into the company in October, 1944, the plaintiff was importuned by Soucy and Grasso to buy more stock. They assured him that the company was a good thing, and that if he should buy enough to make his holdings equal to Brady's, he would have the privilege of receiving a salary on the same basis. On January 16, 1945, the plaintiff bought from the company fifty-one shares of preferred and two hundred nine class "B," and from Soucy thirty shares class "B," all for $9,641. On October 31, 1946, he acquired one hundred seventy-eight shares for cash and two hundred four shares for services rendered and materials furnished. In the spring of 1946 the plaintiff began to receive $150 weekly for setting up the machinery and equipment at the new plant and later for work as maintenance man. Through July, 1946, his services were worth $150 a week, but thereafter only $50 a week. Although his duties resembled those of an employee, his compensation was computed not upon the basis of what his services were reasonably worth but upon the basis of his stockholdings, what the other stockholders were receiving, and the ability of the company to pay. In 1946 he received $4,630 in all. In the spring of 1947, after he had criticised Soucy and accused him of mismanagement, Soucy restored him to the payroll. When this did not quiet him, however, he was taken off in June, 1947, after receiving $675 in that year. The plaintiff's service to the company was insignificant compared with that of Soucy and Brady.

In January, 1947, all the stockholders, including the plaintiff, met, discussed salaries and the financial affairs of the company, and agreed that all salaries to stockholders should be suspended save in the case of Grasso, who was reduced to $50 weekly. No further payments were made except to Grasso and the $675 to the plaintiff. Grasso gave full time to his job as superintendent in charge of plant operations. He worked as an employee, expecting to be paid and under such circumstances that the company ex-

pected to pay him. His compensation began at $40 weekly and attained $150 weekly in 1946. He received $2,548 in 1943, $3,675 in 1944, $5,300 in 1945, $7,600 in 1946, and $3,650 in 1947. These amounts were fair and reasonable compensation.

Throughout 1946 the plaintiff knew that the individual defendants were receiving salaries and the amounts. He made no objection until December, 1946, when he learned for the first time that Brady had been paid a salary in 1945, and when the complaints about spoiled merchandise had become so general and serious that the future of the company was very doubtful. On March 19, 1947, at a meeting at which all the stockholders were present the treasurer's report for the year ending January 31, 1947, was submitted and approved.

In the fall of 1947, Soucy began to arrange for an orderly liquidation. At a meeting of unsecured creditors on December 17, 1947, Soucy, who was an unsecured creditor for about $39,000 for money lent, proposed to subordinate his right to participate in the proceeds of the sale of tangible personal property but not of the real estate, and if there should not be enough to pay general creditors in full he would absorb any loss up to $15,000.

On March 22, 1948, the plaintiff requested the company to bring suit against the individual defendants. On April 7, 1948, at a meeting of the board of directors the request was unanimously denied. The present suit was filed on May 5, 1948. No other stockholder is interested in joining with the plaintiff in the suit. When the hearings closed, the company was still in the process of liquidation, and the general creditors had received sixty-five per cent from the sale of the real estate.

In ordering the entry of a decree dismissing the bill, the judge stated, "I find that the plaintiff is guilty of laches by waiting until March 22, 1948, before taking definite steps; and I rule that upon the facts hereinbefore found . . . the plaintiff is estopped from maintaining this suit."

(a) Grasso, although a director, was not for that reason

barred from accepting reasonable compensation for his services as superintendent performed in such circumstances that both he and the company expected that payment would be made. *Apsey* v. *Chattel Loan Co.* 216 Mass. 364, 366. *Davis* v. *Continental Realty Co.* 320 Mass. 428, 431, and cases cited. It was not essential that the salary be shown by formal votes spread on the corporate records. *Fisk* v. *New England Tire & Supply Co.* 244 Mass. 364, 372. *Calkins* v. *Wire Hardware Co.* 267 Mass. 52, 66. *Cook* v. *Cook*, 270 Mass. 534, 540. Contrary to the plaintiff's contention, there are no findings of conduct by Grasso which was adverse to the best interests of the company, much less that there was conduct so adverse as to warrant a denial of compensation. *Shaw* v. *Harding*, 306 Mass. 441, 447.

(b) The payments to Soucy and Brady, however, not only were apparently in excess of reasonable compensation, but their services were rendered under circumstances from which an obligation to pay was not implied. Such payments, accordingly, do not fall within the principle of the cases cited in the foregoing paragraph. Their so called salaries, made as a division of profits without proper authorization by the company, would ordinarily be recoverable in a stockholders' bill. *Blair* v. *Telegram Newspaper Co.* 172 Mass. 201. *Von Arnim* v. *American Tube Works*, 188 Mass. 515, 517. *Fillebrown* v. *Hayward*, 190 Mass. 472, 478. *Atherton* v. *Emerson*, 199 Mass. 199, 218. *Lydia E. Pinkham Medicine Co.* v. *Gove*, 303 Mass. 1, 9.

The judge, however, went on to find that the plaintiff was guilty of laches in waiting so long before taking any definite steps. We pass by this point in order to consider his ruling that on the other findings the plaintiff is estopped from maintaining this suit. The plaintiff argues that the word "estopped" was used loosely as a synonym for "barred" and "not in the legal sense of the word 'estoppel.'" See *Lunt* v. *Aetna Life Ins. Co.* 261 Mass. 469, 473. We cannot accede. The answer alleges that "the plaintiff knew of all the activities for which he seeks relief at the time they took place, received compensation for services . . . during 1946

and part of 1947 . . . and accordingly is barred by acquiescence and laches from prosecuting this complaint." And while not estoppel in a strict sense, a defence may be allowed in an appropriate case where there is acquiescence. In *Dunphy* v. *Traveller Newspaper Association*, 146 Mass. 495, 500, it was said, "It is a familiar principle of equity jurisprudence, that long continued acquiescence in a course of conduct by one interested in it, especially when the rights of others are affected thereby, will induce the court to refuse him relief upon his subsequent complaint of it." In *Stewart* v. *Finkelstone*, 206 Mass. 28, 36, it was said that "if there has been actual or passive acquiescence in the performance of the act complained of, then equity will ordinarily refuse her aid for the establishment of an admitted right . . . . It would be contrary to equity and good conscience to enforce such rights when a defendant has been led to suppose by the word, silence or conduct of the plaintiff that there was no objection to his operations." *Soghomonian* v. *Garabedian*, 231 Mass. 445, 446–447. *Fenton* v. *Malfas*, 286 Mass. 339, 341. See *Loud* v. *Loud*, 129 Mass. 14, 19; *Chapman* v. *Chapman*, 224 Mass. 427, 433–434; *Langewald* v. *Langewald*, 234 Mass. 269, 272. See also *Durfee* v. *Durfee & Canning, Inc.* 323 Mass. 187, 202–203. Acquiescence is conduct from which may be inferred assent with a consequent estoppel or quasi estoppel. *Lowndes* v. *Wicks*, 69 Conn. 15, 30–31. *Bay Newfoundland Co. Ltd.* v. *Wilson & Co. Inc.* 24 Del. Ch. 30, 36. Pomeroy, Eq. Jur. (5th ed.) §§ 816, 819, 965. Story, Eq. Jur. (14th ed.) §§ 2003, 2023. 19 Am. Jur., Estoppel, § 62. See *Lux* v. *Haggin*, 69 Cal. 255, 269–270; 1 C. J. S., Acquiescence, 917, note.

The question which is not altogether free from difficulty is whether the ruling that the plaintiff is estopped was proper on the facts found. There is no doubt about the payments to Soucy up to May 31, 1944. They were made with the knowledge and acquiescence of all the stockholders. It is unnecessary to consider the effect of the fact that the plaintiff did not become a stockholder until that day. See *Home Fire Ins. Co.* v. *Barber*, 67 Neb. 644. Compare

*Pollitz* v. *Gould,* 202 N. Y. 11. See also 13 Am. Jur., Corporations, § 457; 18 C. J. S., Corporations, § 566. Nor is there any doubt about 1946. There is an express finding that throughout that year the plaintiff knew that the individual defendants were receiving salaries and the amounts.

The difficulty lies in the finding that the plaintiff did not know until December, 1946, that Brady received a salary in 1945, and in the absence of any finding with respect to his knowledge as to a salary to Soucy in 1945 or as to salaries to Soucy and Brady in 1944 after May 31. It is found, however, that at a stockholders' meeting on October 17, 1944, a letter from Soucy to Brady with Brady's written acceptance was entered in the minutes. It is plain that any stockholder who was present or knew of it had knowledge of the fundamental fact that payments to Soucy and Brady were to be made in a ratio of three to one, approximately in accordance with their stockholdings. Nothing discloses whether the plaintiff was present at that meeting or was aware of the entry in the minutes. Nevertheless that he did have seasonable knowledge of that fundamental fact is apparent from the finding that before buying more shares on January 16, 1945, the plaintiff was informed that should he buy enough to equal Brady's holdings, "he would be given the same privilege of getting a salary on the same basis." His purchases on that date made his holdings equal to those of Brady, but he did not work in 1945. In 1946 and 1947, respectively, when he did work, the plaintiff uncomplainingly received $1,300 and $675 more than did Brady. On October 31, 1946, the plaintiff's stockholdings became higher than Brady's, but the reverse became true on March 19, 1947. Finally, there is the same finding, as in the cases of Soucy and Brady, that the sums paid to him were according to his stockholdings in relation to what other stockholders were receiving and the ability of the company to pay. Here is enough proved to require the conclusion that the division of earnings under the guise of salaries but in proportion to stockholdings was a practice approved by him. While he may not have been aware of the details of every such pay-

ment in the last half of 1944 and in 1945, his conduct throughout 1946, amounting to the fullest participation in the scheme, was ample to give his indelible mark of approbation to the method. Having shared in its advantages, he cannot now be heard to challenge it. He had committed himself to a course inconsistent with subsequent repudiation. *Finch* v. *Warrior Cement Corp.* 16 Del. Ch. 44, 61–62. *Trounstine* v. *Remington Rand, Inc.* 22 Del. Ch. 122, 130–131. *Frank* v. *Wilson & Co. Inc.* 24 Del. Ch. 237, 245–246. *Brown* v. *DeYoung,* 167 Ill. 549. *Russell* v. *Louis Melind Co.* 331 Ill. App. 182, 186. *Conners* v. *Conners Bros. Co.* 110 Maine, 428. *McLaughlin* v. *McLaughlin, Ward & Co.* 277 Mich. 419. *Rabe* v. *Dunlap,* 6 Dick. (N. J.) 40, 46–47. *Warner* v. *Morgan,* 81 Misc. (N. Y.) 685. *Allen* v. *Wilson,* 28 Fed. 677. Ballantine, Corporations, 362. Fletcher, Cyc. Corporations, § 5862. Morawetz, Corporations (2d ed.) § 262.

This result is just enough, particularly in a case where no one cares to join in the suit with the plaintiff, who makes no suggestion that any sums received by him should be returned.

*Decree affirmed.*