## TIDEWATER REALTY, LLC

v.

## STATE of Rhode Island and PROVIDENCE PLANTATIONS et al.

No. 2006–197–Appeal.

Supreme Court of Rhode Island.

March 14, 2008.

Paul Sanford, Esq. (Tidewater Realty), for Plaintiff.

Thomas Palumbo, Esq. (for State), Jeffrey Gladstone, Esq. (for City), Providence, for Defendant.

Present: WILLIAMS, C.J., FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice FLAHERTY, for the Court.

A clash over the right to purchase commercial waterfront property in the City of Providence gives rise to this dispute. The plaintiff, Tidewater Realty, LLC (Tidewater), appeals from a summary judgment of the Superior Court that was granted in favor of the defendants, the State of Rhode Island, Rhode Island Department of Environmental Management, Rhode Island State Properties Committee (SPC), City of Providence, and Providence Redevelopment Agency (PRA). For the reasons set forth in this opinion, we affirm in part and reverse in part the judgment of the Superior Court.

### Facts and Procedural History

In 2004, the state determined that its ownership of commercial waterfront property (the Shipyard or the property) at 242 Allens Avenue in Providence was surplus to its needs, and it decided to sell the property. The Shipyard consists of more than five acres of land, currently subject to a long-term lease to Promet Marine Services Corporation (Promet). Promet operates a shipyard, ship repair facility, and deep-water terminal on the property, and has done so for over thirty years. The lease with Promet encumbers the land until 2011.[1]

The state originally had acquired the property by condemnation, and it therefore was bound to follow the procedures set forth in G.L.1956 § 37-7-3.[2] This procedure includes (1) granting a right of first refusal to the owner at the time of condemnation, his heirs, and assigns, and, (2) if the right of first refusal is not exercised, granting a second option to purchase to

1. However, Promet has an option to extend the lease until 2021.

2. General Laws 1956 § 37-7-3 says in relevant part:

 "Whenever in the opinion of the acquiring authority any land or other real property or interest therein taken by condemnation is no longer required for the purpose for which it was taken, the acquiring authority, with the approval of the state properties committee, may, with the consent of the person or persons from whom the land, property, or interest was obtained, or their heirs, successors, or assigns, convey the property or any part thereof, with or without suitable restrictions, by executing and recording a deed thereof. * * * [P]rovided, however, the person or persons in whom the title to the land or property or interest therein was vested at the time it was acquired under the provisions of this chapter shall, if living, have the right to lease, purchase, or reinvest him or herself or themselves, as the case may be, of the land or property or interest therein before the property may be leased, sold, or conveyed as provided by this section. A prior right shall be conclusively presumed to have been waived in the event that a written offer to lease, sell, or convey the property, containing the terms and conditions of the offer, shall be sent by registered or certified mail to the last known address of the person or persons, and the offer shall not have been accepted within thirty (30) days from the date of the mailing. *In the event the prior right to purchase or lease the land or real property shall be waived by the person or persons in whom the title to the land or property or interest therein was vested, the city or town wherein the land or property is situated shall have the second right to purchase or lease the land and property upon the same terms and conditions as the acquiring authority was willing to sell or lease the land or property to the vested person or persons thereof.* A second right to purchase or lease the land or property shall be conclusively presumed to have been waived in the event a written offer to sell or lease the same, containing the terms of the offer, shall have been sent by registered or certified mail to the city or town clerk, as the case may be, wherein the land and property are situated and the offer shall not have been accepted within thirty (30) days from the date of the mailing." (Emphasis added.)

the "city or town wherein the land or property is situated." *Id.*

In August 2004, the state issued "Requests for Proposals" to begin a public bidding campaign for the sale of the property. Promet expressed interest in purchasing the property, and it formed plaintiff, Tidewater Realty, LLC, specifically for this purpose. After the state conducted a protracted bidding process, Tidewater emerged as the winner. In February 2004, the state sent a standard printed notification to a wide variety of public agencies of its intent to sell the property.[3] It announced the state's intention to convey the property and inquired if each agency (1) had any objection to the transaction or (2) had any use for the property.

According to § 37–7–3, a second statutory right of purchase arose on behalf of the City of Providence. The city's right of purchase was conditional on its acceptance of the same terms and conditions that already had been agreed upon by Tidewater. Only if the city waived its statutory rights could the property be then conveyed to Tidewater.

On February 17, 2004, the director of planning and development for the City of Providence, Thomas Deller, received one of the above-referenced printed notifications, and he penned a handwritten response at the bottom of the form that simply said:

"If the property is sold to the present tenant for continuation of its use for boat repair, the city has no interest. If Promet decides it is not interested in the property, the city is interested."

The SPC voted unanimously to approve the purchase and sales agreement with Tidewater on May 25, 2005. In its May 25, 2005 meeting notes, the SPC noted that,

"[t]here is one matter still open and that is the notice sent to the City of Providence, officially notifying them of the terms and conditions of the contract and the Department is now within the 30 day window that the City has to respond. The Department has been told that they are not interested in entertaining this same purchase under the terms and conditions, but the Department will let that 30 day window expire."

The terms and conditions of the state's contract with Tidewater included a purchase price of $1,026,780, a closing date no later than June 30, 2005, and a clause declaring that "[t]ime is of the essence." In its final clause, the purchase and sales agreement said:

"21. *Right to Terminate.* Not withstanding anything contained herein to the contrary, this Contract is conditional upon the City of Providence waiving its right to purchase this property under the same terms and conditions contained herein in accordance with R.I. General Laws Section 37–7–3. Said required notice to City was made by certified mail on May 18, 2005. If the City of Providence chooses to exercise its rights as provided in R.I. General Laws Section 37–7–3, then this contract will terminate and be deemed null and void."

On June 14, 2005, Providence Mayor David N. Cicilline informed the state that the city intended to exercise its right to purchase the property. Soon after, on June 17, 2005, the City Council passed Resolution No. 280, authorizing the PRA to acquire the property, as the city's agent

---

3. The same form was sent to the following agencies: the Department of Transportation, Office of Statewide Planning, Planning and Development Director, Historical Preserva- tion Committee, Coastal Resources, Rhode Island State Police, Department of Elderly Affairs, and the Rhode Island Economic Development Corporation.

and on its behalf.[4] Because of the communication from the city, the SPC, relying upon clause 21 of the purchase and sales agreement with Tidewater, terminated the contract after it determined that the agreement was void. Tidewater objected, contending that it was ready, able, and willing to complete the transaction. Nevertheless, the state conveyed the property to the PRA. Tidewater, which had recorded a *lis pendens* in the Land Evidence Records with respect to the transaction, then filed suit in the Superior Court.

In the first count of its first amended complaint, Tidewater alleged that the State of Rhode Island had breached the purchase and sales agreement (the agreement or contract) of May 25, 2005 because it deeded the property to the PRA rather than to the "City of Providence," which is the entity specified in clause 21 of the agreement. The plaintiff also sought a declaratory judgment that the conveyance to the PRA was null and void because (1) it was not in accordance with § 37–7–3, (2) the city had no authority to create an agency relationship to exercise its statutory right to purchase the property, and (3) the PRA's purchase of the property exceeded its statutory powers under G.L. 1956 § 45–32–5. The plaintiff argued that the statute does not permit the purchase of property outside of a redevelopment area by the PRA absent a redevelopment purpose and without following specific statutory procedures. The plaintiff contended that the PRA's actions exceeded its authority and the conveyance of the property to the PRA was null and void. Therefore, plaintiff alleged that the state breached its agreement with Tidewater.

The plaintiff also asserted that the city waived its statutory right to purchase under § 37–7–3 because of Deller's February 2004 letter and the city's subsequent sixteen months of inaction before its acceptance on June 14, 2005. The plaintiff, in the second count of its first amended complaint, sued the City of Providence and the PRA for tortious interference with contractual relations, contending that they had purchased the property out from under plaintiff.

The state, City of Providence, and PRA, moved to dismiss the complaint under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure, and in the alternative they moved for summary judgment under Rule 56 of the Superior Court Rules of Civil Procedure, arguing that the complaint failed to state a claim upon which relief could be granted, that no issue of material fact existed, and that plaintiff's claims were barred as a matter of law. Opposing defendants' motion, Tidewater argued that the issue of waiver was a factual question for the jury and that the legal claims should be decided in its favor.

The Superior Court granted the motion for summary judgment in favor of the state, and it denied plaintiff's claim for declaratory relief. The Court found that the state was not liable for breach of contract because the agreement properly was terminated in accordance with its explicit terms. The Court also held that the city did not waive its right to purchase the property and the city was not prohibited from using an agent to exercise that right to purchase. The Court further ruled, citing this Court's holding in *Belliveau*

**4.** The Providence City Council Resolution No. 280 says that the city chose not to buy the Shipyard itself because "the Home Rule Charter, Section 416, contains limiting language which would preclude the City from closing the transaction by June 30, 2005; * * * [and]

the Providence Redevelopment Authority has no such constraints." The Providence Home Rule Charter requires ten days public notice and also requires that the city assessor determine the market value of the property when the property costs over $2,000.

*Building Corp. v. O'Coin,* 763 A.2d 622, 629 (R.I.2000), that plaintiff's claims against the city and PRA for tortious interference with contractual relations were meritless because the city and PRA both had a colorable property interest at stake. The plaintiff timely appealed.

On appeal, plaintiff argues that the Superior Court committed error when it determined that the city did not waive its rights as a matter of law. The plaintiff also contends that the state breached the contract with it because it did not convey the property to the city, as required by the contract and by statute. Furthermore, plaintiff argues that the state breached by conveying to the PRA, because the PRA's purchase was an *ultra vires* act, and the resolution by the city, creating an agency relationship with the PRA, was *ultra vires* as well.

### Standard of Review

■ "A motion to dismiss for failure to state a claim is 'treated as one for summary judgment when "matters outside the pleading are presented to and not excluded by the court." ' " *Franklin Grove v. Drexel,* 936 A.2d 1272, 1275 (R.I.2007) (quoting *Steinberg v. State,* 427 A.2d 338, 339 n. 2 (R.I.1981) and Rule 12(b)(6)). "The party opposing the motion for summary judgment 'carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions.' " *Taylor v. Mass. Flora Realty, Inc.,* 840 A.2d 1126, 1129 (R.I.2004) (quoting *United Lending Corp. v. City of Providence,* 827 A.2d 626, 631 (R.I.2003)).

■ The Supreme Court conducts a *de novo* review of a grant of summary judgment, following the same standards as the trial justice. *United Lending Corp.,* 827 A.2d at 631. On appeal, this Court,

like the trial justice, "must look for factual issues, not determine them." *Capital Properties, Inc. v. State,* 749 A.2d 1069, 1080 (R.I.1999) (quoting *Palmisciano v. Burrillville Racing Association,* 603 A.2d 317, 320 (R.I.1992)). This Court will affirm a summary judgment if "we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Woodland Manor III Associates v. R.E. Keeney,* 713 A.2d 806, 810 (R.I.1998) (quoting *Rotelli v. Catanzaro,* 686 A.2d 91, 93 (R.I. 1996)).

■ "Questions of law and statutory interpretation * * * are reviewed *de novo* by this Court." *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates,* 763 A.2d 1005, 1007 (R.I. 2001). In carrying out our duty as the final arbiter on questions of statutory construction, "[i]t is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1226 (R.I. 1996).

■ When faced with ambiguous statutory language "the primary object of the [C]ourt is to ascertain the legislative intention from a consideration of the legislation in its entirety, viewing the language used therein in the light, nature, and purpose of the enactment thereof." *State v. Smith,* 766 A.2d 913, 924 (R.I.2001) (quoting *Mason v. Bowerman Bros., Inc.,* 95 R.I. 425, 431, 187 A.2d 772, 776 (1963)). However, this Court "will not construe a statute to achieve meaningless or absurd results." *Beaudoin v. Petit,* 122 R.I. 469, 476, 409 A.2d 536, 540 (1979) (citing *Town of Scituate v. O'Rourke,* 103 R.I. 499, 512–13, 239 A.2d 176, 184 (1968) and *Zannelli v. Di*

*Sandro,* 84 R.I. 76, 81–82, 121 A.2d 652, 655 (1956)).

## Tortious Interference with Contractual Relations Claim

Tidewater appeals the grant of summary judgment in favor of the city and the PRA on its count of tortious interference with its contract with the state. Indeed, this is a direct claim that plaintiff made against the city and PRA. The city and PRA argued below, and also on appeal, that this Court's holding in *Belliveau Building Corp.,* 763 A.2d at 629, eviscerates any tortious interference claim as a matter of law.[5]

■■■■■ To prevail on a claim of tortious interference with contractual relations, a plaintiff must show "(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) his [or her] intentional interference; and (4) damages resulting therefrom." *Smith Development Corp. v. Bilow Enterprises, Inc.,* 112 R.I. 203, 211, 308 A.2d 477, 482 (1973). This Court recently clarified that the mere existence of intentional interference is not enough; there must be *improper* interference. *Avilla v. Newport Grand Jai Alai, LLC,* 935 A.2d 91, 98 (R.I.2007) (holding that a supervisor's interference with an employee's prospective contract because he believed the employee was cheating at jai alai was not improper as a matter of law). In *Belliveau Building Corp.,* 763 A.2d at 629, we stated that "a rival claimant's good-faith assertion of a colorable property interest, when properly communicated by appropriate means (such as the filing of a truthful notice in the land-evidence records), is privileged and constitutes a defense to a claim of tortious interference with contract." The city, through the PRA, attempted to exer-

cise the city's statutory right to purchase the property under § 37-7-3. In our opinion, this was a good-faith assertion of a claimed statutory property right. We agree with the Superior Court that *Belliveau Building Corp.* forecloses any tort claim against the city and PRA for interference, and we affirm the grant of summary judgment with respect to this claim.

## The City's Waiver of Its Rights under G.L.1956 § 37-7-3

As a preliminary argument, plaintiff contends that the city's waiver of its rights under § 37-7-3 is a question of fact that should be decided by a fact-finder and that it is not appropriate for disposition by summary judgment. It cites the holdings in *Hoffman v. McLaughlin Corp.,* 703 A.2d 1107, 1113 (R.I.1997) and *Gagner v. Strekouras,* 423 A.2d 1168, 1170–71 (R.I.1980) to support its position that the trial justice erred by deciding the issue of waiver as a matter of law. Tidewater contends that the issue of waiver always must be left for determination by the finder of fact after trial. *See Hoffman,* 703 A.2d at 1113 (quoting *Haxton's of Riverside, Inc. v. Windmill Realty, Inc.,* 488 A.2d 723, 725–26 (R.I.1985) ("As a general rule the question of whether a party has voluntarily relinquished a known right is one of fact for a jury.")). However, plaintiff offers no material facts that it contends are in dispute; it provides only a timeline of events that either are undisputed or irrelevant.

In *Hoffman,* 703 A.2d at 1109, the buyer and seller entered into a purchase and sales agreement for certain real estate holdings and an automobile parts business. The contract contained a termination clause, providing that upon breach of the agreement by either party, the other party

---

**5.** We note that Tidewater has not attempted to distinguish *Belliveau Building Corp. v.* *O'Coin,* 763 A.2d 622 (R.I.2000) and did not brief or argue the issue before this Court.

could terminate the agreement. *Id.* at 1110–11. The defendant buyer justified terminating the contract by a claim that the plaintiff's deficient work performance qualified as a breach. *Id.* at 1110. Because of a series of evidentiary rulings by the trial justice, the defense was unable to question the plaintiff about his work performance, and he was unable to present any other evidence relating to that performance. *Id.* at 1111. At the end of trial, the trial justice granted a motion for a directed verdict in favor of the plaintiff. *Id.* On appeal, we vacated and sent the matter back for a new trial. *Id.* at 1113. We held that there was a dispute of fact with respect to whether a breach occurred, and we also held that the defendant should have been afforded the opportunity to present evidence with respect to that issue. *Id.*

In *Gagner*, 423 A.2d at 1171, we vacated a grant of summary judgment in a personal injury claim. There, the plaintiff and the defendant were involved in an automobile collision and the defendant's insurer began to negotiate with the plaintiff. *Id.* at 1169. The defendant's insurer allegedly assured the plaintiff that it was "just a matter of coming to an agreeable figure" and that there was no question of liability for the accident. *Id.* Eventually, the negotiations were unsuccessful and the plaintiff filed suit. *Id.* The defendant argued that the plaintiff's claim was barred by the statute of limitations, and the hearing justice agreed and granted summary judgment on that issue. *Id.* On appeal, we held that summary judgment was inappropriate because the defendant could be estopped from raising the statute of limitations as a defense if he had lulled the plaintiff into a reasonable belief that the matter would be settled without litigation. *Id.* at 1170. We said that the determination of whether estoppel applied "depends upon the character of the negotiations and the circumstances surrounding the parties" and we held that there was a dispute with respect to (1) whether the plaintiff's attorney did in fact rely upon the statements allegedly made and (2) whether he was justified in his belief that the statute of limitations would not bar a settlement of the personal-injury claim. *Id.* at 1171 n. 1.

We conclude that these cases are inapposite to the issues presented in this case because Tidewater is unable to demonstrate a single material fact that is disputed. The statute provides for a conclusive presumption of waiver of a municipality's rights after a certified notice is sent to the city and if there is no response within thirty days. The express terms of the purchase and sales agreement acknowledged that the state sent a certified notice to the city on May 18, 2005. It is undisputed that the mayor of Providence responded on June 14, 2005, within the thirty-day window, with a letter indicating the city's intent to exercise its statutory option to purchase and accepting the terms and conditions of the state's agreement with Tidewater.

We agree with the hearing justice that this issue was ripe for summary judgment because all that remained was a legal determination of whether the city's actions and inactions, before the June 14 letter, constituted a legal waiver of the city's rights under § 37-7-3.

■ The plaintiff argues that, as a matter of law, the city waived its rights because of its overall behavior, beginning with what it calls the "waiver letter" from Deller and culminating with the subsequent sixteen months of inaction. These facts are utterly insufficient to serve as a basis for finding waiver on the part of the city, and we affirm the Superior Court's grant of summary judgment for the city.

■ "[W]aiver is the voluntary, intentional relinquishment of a known right." *Sturbridge Home Builders, Inc., v. Downing Seaport, Inc.,* 890 A.2d 58, 65 (R.I. 2005) (quoting *Lajayi v. Fafiyebi,* 860 A.2d 680, 687 (R.I.2004)). Section 37–7–3 gives the city a right of purchase on the same terms and conditions as the state was willing to sell the property to Tidewater. The purchase and sales agreement between Tidewater and the state clearly says that "this Contract is conditional upon the city of Providence waiving its right to purchase this property under the same terms and conditions contained herein in accordance with R.I. General Laws Section 37–7–3."

■ We first observe that even if Deller's statement that "the City is not interested" could be construed as constituting language of a waiver, Deller lacked the authority to make that decision and could not bind the city. It is a well-settled principle that a municipal employee cannot bind the city without possessing the actual authority to do so. *Warwick Teachers' Union Local No. 915, AFT, AFL–CIO v. Warwick School Committee,* 624 A.2d 849, 851 (R.I.1993) (citing *School Committee of Providence v. Board of Regents for Education,* 429 A.2d 1297, 1302 (R.I.1981)). Apparent authority and reliance on the part of the plaintiff are not adequate. *Id.* at 852. Thus, Tidewater's theory that Deller's letter constituted a waiver is meritless as a matter of law. Indeed, although Deller is the director of planning and development for the City of Providence, it is not even alleged by Tidewater that he had actual authority to waive the city's rights with respect to § 37–7–3.

Second, we do not regard the city's lack of involvement prior to the certified notice that outlined the terms of the agreement between Tidewater and the state, as a knowing voluntary relinquishment of its right under the statute. The city's statutory option was to accept or reject the purchase of the Shipyard on the same terms and conditions as had been negotiated between the state and Tidewater. The only way the city knowingly could waive its rights under the statute was to do so *after* those terms and conditions had been negotiated; anything that occurred before that time seems completely irrelevant to us. Section 37–7–3 does not require that the city become an active participant in the process of the state's sale of excess land acquired by condemnation until an agreement has been reached to sell the land to a third party. Only at that point must the city accept it or waive its statutory rights.

The initial "notification of sale" letter sent by the state to Deller, and to several other public agencies, contained none of the terms or conditions of the proposed sale. Even if Deller, in his capacity as director of planning and development for the City of Providence, had the actual authority to waive the city's rights, he did not have any of the information that would allow him to waive a "known" right. The form letter provided to him did not indicate how much money the property would be sold for, who the potential buyers were, or any of the other conditions that eventually attached with respect to environmental considerations.

The February 18, 2004 letter merely was a standard form, sent to a variety of agencies, notifying them that the sale of the property was contemplated. We hold that the city did not relinquish its right before it was notified of the terms and conditions of the sale by certified mail on May 18, 2005.[6]

6. In its brief, plaintiff cites *Uccello v. Gold'n Foods, Inc.,* 325 Mass. 319, 90 N.E.2d 530 (1950) and argues that by not taking affirmative action during the time leading up to

## The Conveyance to the PRA

 Tidewater also argues that the state breached the contract with it because the termination clause was effective only if the city properly exercised its right to purchase the property under § 37-7-3. It asserts that the city strayed beyond its statutory entitlement when it designated the PRA as its agent because the PRA had no authority to purchase the property. The Superior Court granted summary judgment in favor of the state, holding that § 37-7-3 did not prohibit the use of an agent on behalf of the city. On appeal, plaintiff argues that the city did not exercise its right in accordance with the statute because (1) the property was conveyed to the PRA and not the city; (2) the city did not have the power to designate an agent to exercise its prerogative under § 37-7-3; and (3) the PRA acted *ultra vires* in purchasing the property.[7]

 The narrow question before this Court is whether the purchase by the PRA was valid. In our opinion, the PRA did not comply with the procedures set forth in the Redevelopment Act of 1956, or the legislative purposes set forth therein. Because the PRA did not have the authority under § 45-32-5 to purchase this property, the conveyance of the property to it was a breach of Tidewater's purchase and sales agreement by the state.[8] In our opinion, because the state neither conveyed the Shipyard to the city nor to Tidewater within the time prescribed in the agreement, it breached its obligation to Tidewater. Therefore, we reverse the grant of summary judgment in favor of the state.

The Redevelopment Act of 1956 outlines the powers and purposes of redevelopment agencies in Rhode Island. Section 45-32-5(a)(4) governs the powers of the redevelopment agencies to purchase property. It provides in pertinent part:

"*Within the redevelopment area* or *for purposes of redevelopment:* to purchase, lease, obtain an option upon, acquire by

---

Mayor Cicilline's letter of acceptance on June 14, 2005, the city impliedly waived its ability to purchase the land. In *Uccello,* the Supreme Judicial Court of Massachusetts discussed whether the plaintiff stockholder was barred by the equitable principles of acquiescence and laches from filing suit against the defendant corporation. *Id.* at 535. We believe that the *Uccello* case does not apply to the situation at hand. It is conceivable, under the right set of facts, that someone with actual authority could waive the city's right prior to the thirty-day deadline provided in § 37-7-3; however, the facts before us have not demonstrated that this is the case here. There is no " 'clear, unequivocal, and decisive act' " by the city in waiving its right to purchase. *Sturbridge Home Builders, Inc. v. Downing Seaport, Inc.,* 890 A.2d 58, 65 (R.I. 2005).

7. The defendants contended at oral argument that the purchase and sales agreement between the state and Tidewater terminated on June 14, 2005, when Mayor Cicilline expressed the city's intent to exercise its option

to purchase. The contract language contained in clause 21 proved that the termination of the contract occurs upon the event *that waiver by the city does not occur.* However, a letter expressing the city's intent to exercise its option to purchase is not conclusive that the city has *not waived* its rights. Whether waiver occurs depends upon whether the city has fulfilled the terms and conditions of the contract in accordance with its right to purchase under § 37-7-3. For example, if the mayor said that the city would exercise its right to purchase, but subsequently the city was unable to do so according to the terms and conditions agreed upon, that would constitute a waiver. Therefore, the original purchase and sales agreement would not be terminated and would still bind the original parties.

8. Because we hold that the conveyance of the property to the PRA was invalid, we need not address the issue of whether the city legitimately could have designated some other city agency to take title.

gift, grant, bequest, devise, or otherwise, any real or personal property, or any estate or interest in it, together with any improvements on it; to acquire by the exercise of the power of eminent domain any real property or any estate or interest in it, although temporarily not required to achieve the purposes of chapters 31–33 of this title * * *." Section 45–32–5(a)(4) (emphases added).

The defendants argue that the PRA has the power to purchase the property not only because the property falls within a redevelopment area, but also because it was purchased for purposes of redevelopment. General Laws 1956 § 45–31–8(15) defines "redevelopment area" to mean "any area of a community which its legislative body finds is a blighted and substandard area whose redevelopment is necessary to effectuate the public purposes declared in this chapter." Furthermore, "redevelopment" has a statutory definition; it means "the elimination and prevention of the spread of blighted and substandard areas." Section 45–31–8(14).

Our holding in *Capital Properties, Inc.,* 749 A.2d at 1087 is instructive. There, we considered the power of the PRA to condemn certain property under the Redevelopment Act. *Id.* at 1075. In that case, neither the Redevelopment Agency nor the City Council had made any findings of fact to support the conclusion that the parcel of land was "blighted and substandard," or in danger of becoming such an area. *Id.* at 1087. For that reason, we reversed the lower court and entered judgment for the plaintiff because the evidence showed that the area was considered by the parties to be a very valuable location and the con-

demnation did not follow the purposes of the chapter or the process set forth in it.[9] *Id.*

We are certainly cognizant that the issue before us concerns acquisition by purchase, and not acquisition by condemnation. But, we think that the vehicle of acquisition is less significant than the importance of the PRA following its prescribed statutory requirements and procedures before it exercises its broad powers, whether that is the power to condemn or purchase.

### Did the PRA have a Redevelopment Purpose?

The resolution of the City Council, passed on June 17, 2005, declares:

"1. Having reviewed and considered * * * *the current uses of the Property, the revenue from the lease of the Property, and the potential importance of the Property* to the City for public uses and public purposes including, without limitation, the economic development potential benefiting the City from future use and development of the Property * * *.
" * * *

"4. The City is also authorized to designate the Providence Redevelopment Agency as Agent of the City *to acquire the Property directly and to hold, own, and manage* such Property for the interest of the City and the Providence Redevelopment Agency and, pursuant to Section 45–32–5(c) of the R.I. General Laws, the Agency is authorized to hold, own and manage the property for twenty (20) years or until any financing arrangements for the acquisition have been paid in full." (Emphases added.)

---

9. General Laws 1956 § 45–31–7 says:
"It is declared that the purposes of chapters 31–33 of this title are the elimination and prevention of blighted and substandard areas and their replacement through redevel-

opment by well-planned, integrated, stable, safe, and healthful neighborhoods in the manner and by the means provided in these chapters, thereby carrying out the policy of this state, as declared in § 45–31–6."

The purpose of the PRA's acquisition, according to the city resolution that authorized it, was to "hold, own, and manage" the property. Because the purchase is encumbered by the lease to Promet, the PRA's present role would be reduced to collecting rent and perhaps anticipating some future profit that potentially could be made. While that may be a laudable goal, it is not consistent with the agency's statutory mandate to prevent and eliminate blighted areas within the City of Providence. The record is devoid of any document reflecting a finding that the property is blighted or substandard. Indeed, there is no dispute that Promet operates a profitable business at that location.

### Is the Property in a Redevelopment Area?

The PRA and city have provided this Court with a map that depicts the areas referred to in Providence City Ordinances §§ 20–1 to 20–5. The map dissects the City of Providence into four major redevelopment areas and refers to numerous redevelopment project areas that lie within those redevelopment areas. It is significant that neither the city nor PRA has alleged that the Shipyard is "blighted or substandard" nor have they provided any plans for its redevelopment.[10]

We believe that there is a threshold problem with concluding, on the basis of this map alone, that the property falls into a "redevelopment area" as intended by § 45–32–5(4): the city has not provided this Court with the requisite findings necessary to conclude that it was so designated under the statute. The map does not demonstrate that 80 percent of Providence was found by a legislative body to be blighted and substandard. *See* § 45–31–

8(15). Indeed, § 20–1 of the city ordinance merely says that "[t]he city council of the city hereby designates, in accordance with R.I.G.L. 45–32–4, the redevelopment areas as set forth in this chapter," and provides a metes and bounds description of the four areas covering nearly the entire city.

The defendants argue that findings to support a conclusion that the Shipyard lies within a blighted area are unnecessary because such findings, that would limit the PRA in its ability to exercise its powers, are limitations only when dealing with assigning redevelopment projects. The defendants argue that this is inapposite to the situation at hand because the PRA has made only a purchase in a redevelopment area. However, § 45–31–8(17) clearly says that " '[r]edevelopment [p]roject' means *any* work or undertaking of an agency pursuant to chapters 31–33 of this title." (Emphasis added.) The purchase of the Shipyard by the PRA clearly falls within the ambit of the statute and is limited by its terms.

To define the term "redevelopment area" as the city urges would render the statutory definition meaningless. The very purpose of the PRA is to revitalize Providence by preventing and eliminating blighted areas. The statute clearly defines a blighted area and substandard area, and it "includes a 'slum blighted area', a 'deteriorated blighted area', or an 'arrested blighted area', or any combination of these areas." Section 45–31–8(3); *see* §§ 45–31–8(2), (6), and (18).

Based upon the record before us, we are unable to conclude that the Shipyard is a blighted area; moreover, no legislative body has found that the property is in a

---

**10.** In fact, 80 percent of Providence is divided into these four redevelopment areas. The property in dispute in this case falls within redevelopment area four, but has not been assigned as a project area.

blighted or substandard area, as the statute requires. Therefore, in our opinion, the PRA exceeded its statutory authority when it took title to the property for the purposes set forth in City Council Resolution No. 280.

### Conclusion

Accordingly, we reverse the Superior Court judgment with respect to count 1, and we affirm the judgment in favor of the defendants, the City of Providence and PRA, with respect to count 2. The record shall be returned to the Superior Court for entry of a declaratory judgment ruling that the PRA did not have authority to acquire the property and for further proceedings on the plaintiff's first amended complaint.

Justice GOLDBERG did not participate.